2014 UT App 68

STATE of Utah, Plaintiff and Appellee,

v.

Terrill DALTON, Defendant and Appellant.

No. 20120477–CA.

Court of Appeals of Utah.

March 27, 2014.

Herschel Bullen, for Appellant.

Sean D. Reyes and Ryan D. Tenney, for Appellee.

Senior Judge RUSSELL W. BENCH authored this Opinion, in which Judges GREGORY K. ORME and STEPHEN L. ROTH concurred.[1]

1. The Honorable Russell W. Bench, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11–201(6).

Opinion

BENCH, Senior Judge:

¶ 1 Defendant Terrill Dalton appeals from his convictions on two counts of rape, a first degree felony. We affirm.

## BACKGROUND [2]

¶ 2 Around 2004, Defendant founded his own church as a result of experiencing what he called a spiritual revelation. Defendant led his church as its president and appointed his friend, Geody Harman, to act as first counselor. The church grew to include eighty to ninety members, including close family friends and several members of Defendant's own family. Over the years, Defendant and his followers have lived in Utah, Idaho, Nevada, Colorado, and Montana.

¶ 3 As president, Defendant represented himself to the church members as the "Holy Spirit" and, at times, members of the church called Defendant the "Holy Spirit" or the "Holy Ghost." Defendant taught that church doctrine required his approval, sanction, and interpretation and that Defendant served as the judge who discerned the church's doctrine. Church members understood that Defendant was the one who held "all the authority" in the church. If members did not adhere to church laws or doctrine, they faced punishments of private reprimand, public rebuke, or excommunication.

¶ 4 As part of religious life in the church, Defendant, Harman, and other members experienced "impressions." As Harman put it, an "impression" is a feeling that prompts a person to take a beneficial action. Defendant explained impressions as "what God was telling us to do." It was common practice for church members to discuss their impressions with Defendant so that he could judge and ensure the validity of the impressions. One important doctrine of the church, referred to as "the higher doctrine," was "the doctrine of giving seed." This particular doctrine in-

2. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Bluff*, 2002 UT 66, ¶2, 52 P.3d 1210 (citation and internal quotation marks omitted).

volved church members receiving impressions regarding with whom they should engage in sexual relations.

¶ 5 While living in Utah in the fall of 2005, Harman had an impression that he should have sex with a fifteen-year-old church member (Victim), whom Harman regularly employed to babysit his children. Harman approached Defendant to counsel with him about this impression. Defendant responded to Harman's inquiry by telling Harman to pray about it and "make sure it's what God wants." After Harman followed these instructions, Harman approached Defendant a second time and reported that he was "still feeling the same way." Defendant told Harman that he would speak with Victim directly and stated, "It is of God and you best go fulfill it." Harman understood Defendant's words as "an instruction and a command from God's prophet on the earth" that Harman had "better go fulfill."

¶ 6 When Defendant spoke to Victim about Harman's impression, Defendant told her that "God needed [her] to have sex with [Harman], [and] that [she]'d be given a blessing for it." [3] Following this conversation, Defendant instructed Harman to approach Victim. When Harman talked to Victim and asked if she had a similar impression, Victim nodded her head and said yes. Later that week after she had finished babysitting, Harman had sex with Victim at his home. The next day, Harman reported to Defendant that "a command given by God ... was fulfilled." Sometime later that month, Defendant also had sexual intercourse with Victim. Shortly after these incidents of abuse, Victim struggled academically and began skipping class and smoking marijuana. Victim dropped out of school within months.

¶ 7 Approximately four years later, Victim reported her allegations of abuse to the police. Defendant denied that he had had sex with Victim and that he told Victim about Harman's desire to have sex with her. Likewise, Defendant denied having told Victim that she should have sex with Harman and that she would receive a blessing for it.

However, Defendant admitted in interviews with police that Harman told him about his impression that he should have sex with Victim.

¶ 8 In August 2010, Defendant was charged with two counts of rape. The first count of the information (the Information) charged Defendant with having sexual intercourse with Victim without her consent. The second count was based on accomplice liability and charged Defendant as a party to Harman's nonconsensual sexual intercourse with Victim. The Information alleged that both crimes occurred on or about September 1, 2005. Three months before trial, the State amended the information (the First Amended Information), changing the dates of the alleged offenses to having been committed "on or about January 01, 2005 through June 30, 2005."

¶ 9 A three-day jury trial was held in March 2012. Harman and Victim both testified for the State. Harman admitted that he had sex with Victim. Harman explained that after Defendant gave Harman his permission, Harman arranged "to take care of [it]" with Victim at his home after she finished babysitting one evening. After Harman's family went to the park, Harman and Victim prayed and "both felt good about what [they were] about to do." Victim indicated to Harman that she felt the impression again. As Harman and Victim climbed the stairs, Harman noticed that Victim's demeanor was "concerned or withdrawn." Harman further testified that Victim then expressed reluctance and said no to him but that he assured her that they were doing "what ... God wanted [them] to do." Harman asked Victim, "[D]o you want to do what God wants you to do?" At that point, Victim nodded yes, and Harman and Victim proceeded to have sex. Harman also testified that Defendant later told him that Defendant had been intimate with Victim on multiple occasions after Defendant had returned to Utah in the fall of 2005. Harman testified that Defendant had spent the previous two months liv-

---

**3.** Victim understood "a blessing" as when "God was going to do something in return" to help her in her life.

ing in Nevada and that Defendant frequently traveled.

¶ 10 Victim testified that she had sex once with Harman and once with Defendant. Victim testified that Defendant asked her to have sex with Harman. Victim explained that although she did not want to have sex with Harman, she eventually complied with Defendant's directive because she was "told that when [she] was brought before God that [she would] need to face things." Victim was not sure whether she told Harman that she did not want to have sex with him but remembered that Harman told her "this was what the Lord wanted." After she and Harman had sex, Victim indicated that Defendant told her that "the Lord was pleased . . . but he [wanted her] to do it again" with Defendant three times and then she "[would] get a great blessing." Victim testified that she did not want to have sex with Defendant but, within a couple weeks, did so once.

¶ 11 One of Defendant's female relatives (Relative) also testified for the State. Relative testified that in his role as leader of the church, Defendant told her that she "needed to . . . be a prostitute in a way" and "have sex with other people." Relative testified that Defendant told her that she should have sex with him because she would "get many blessings from it" and it was "the only way that he could help [her]" with her depression. Relative stated that Defendant would "try to convince" her to have sex with him "every time he could get [her] alone." After about three months of these conversations, Relative indicated that she had sex with Defendant around 2005 "to get it over with." Afterward, Relative was "really uncomfortable with what had happened." Defendant approached her several times thereafter and suggested that they have sex again to "cure [her] of this mental condition," but Relative told him no. Defendant asked Relative "not to tell certain people" that they had sex and that if anybody did ask, she should tell them that "it happened in the spirit." Relative testified that she came forward with her allegations in April 2011 when she heard Victim's story because it "matched [her own] story of what happened" to her.

¶ 12 Relative's sister (Sibling) also testified. Sibling testified that Defendant propositioned her several times. In particular, Sibling testified that Defendant gave her a piece of paper that indicated she should receive "seed" from "one of the two candlesticks." Defendant explained to Sibling that "[s]eed meant sperm" and that "the spirit t[old] [him]" he was the candlestick. Sibling refused. After Sibling refused to receive Defendant's "seed" on a second occasion, she and Defendant had a four-hour argument "over [Sibling's] moral status and [her] not listening to the Lord's promptings." Sometime later, Defendant and Harman approached Sibling together and told her that Defendant was "prompted" that Sibling "would have a child from him." Sibling resisted all of Defendant's advances.

¶ 13 At trial, Defendant sought to pursue the theory that Victim was motivated to make the abuse allegations in order to obtain money for drugs. The defense called Victim's younger sister (Sister) as its first witness. Defense counsel asked Sister on direct examination, "[B]efore [Defendant] got arrested on these charges did [Victim] ever talk to you about any allegations of sexual misconduct by [Defendant] . . . or [Harman]?" Sister answered, "No." Defense counsel then asked, "After [Defendant] got arrested did you ever talk to [Victim] about the allegations?" When Sister responded inaudibly, defense counsel followed up by asking, "When you say not really, does that mean you did but not too much?" Sister responded, "Yeah, like *I didn't believe her* so we didn't really ever[ ] get into talking about it." (Emphasis added.) Defense counsel proceeded to ask Sister several more follow-up questions about whether Sister asked Victim why she was alleging sexual misconduct.

¶ 14 Following Defendant's direct examination of Sister, the prosecutor requested permission to explore the reasons why Sister did not believe Victim. At a sidebar conference, defense counsel opposed the prosecutor's proposed line of questioning because he "didn't ask [Sister] what her opinion was." The trial court disagreed with the defense and ruled that it was proper for the prosecutor to inquire into whether Sister believed

the allegations because defense counsel had opened the door to that subject matter. Over defense counsel's continued objection, the prosecutor proceeded to cross-examine Sister and to inquire into whether Sister believed Victim's allegations. The prosecutor asked Sister, "Now, how do you feel about [Victim's] story today?" Sister replied, "It's a little different now." When asked to explain why, Sister responded by describing a more recent incident when Defendant had asked Sister to pose naked for pictures. Sister testified that Defendant had told her that she could make money by posting the pictures online.

¶ 15 The defense then called Victim's former roommate (Friend), who had lived with Victim during the time of the abuse. On direct examination, Friend testified that Defendant went to Arizona to preach and moved to Nevada in 2005. Friend also indicated that Defendant would periodically come home to Utah for a couple of days to a week during this time period. Friend testified that Victim never confided in her about any sexual activity involving Harman or Defendant and that Victim's allegations seemed odd to her. Friend further testified that Victim began lying to her in 2005 and that Friend believed only thirty percent of what Victim said to her. On cross-examination, Friend admitted that she was one of the first members of Defendant's church and had two children with Defendant.

¶ 16 Defendant moved for a mistrial, arguing that the testimony of Defendant's request for nude pictures of Sister was inadmissible evidence that was inflammatory and prejudicial. The prosecutor opposed the motion, countering that his cross-examination of Sister was permissible because Defendant had opened the door during his direct examination. According to the prosecutor, Sister's answer that she did not believe Victim's allegations permitted him to ask Sister whether and why her opinion had changed. The trial court denied the motion for a mistrial based on its conclusion that Defendant had opened the door to the nude-pictures testimony and that the evidence was only a tiny piece of the story.

¶ 17 At the close of the second day of trial, the State moved to amend the dates in the information to conform with Victim's testimony regarding when the crimes occurred. The prosecutor asserted that the dates in the First Amended Information were a result of his own misreading of Victim's school records. Defendant opposed the motion to amend. Defendant claimed that he had begun preparing an alibi defense after the Information listed the crimes as having been committed in September 2005 but that he had abandoned his preparations for that defense after the First Amended Information listed the crimes as having occurred in early 2005. Defendant argued that to allow the State to amend the information during trial would prejudice his rights. The trial court granted the State's motion to amend, reasoning that Defendant "had sufficient notice over a very long period of time" about the general time period involved in the case. The resulting amended information (the Second Amended Information) described the two crimes as having been committed "on or about September 2005 through January 2006."

¶ 18 After reviewing the jury instructions, Defendant urged the trial court to submit a mistake-of-fact instruction. In particular, Defendant's proposed instruction would have instructed the jury that an act committed under ignorance or mistake of fact disproves the culpable mental state and that therefore "it is a defense to the charge of Rape as an Accomplice if the defendant had an honest belief that [Victim] was not being raped." Defendant's proposed instruction further explained that if Defendant brought forward some evidence which tended to show that he had an honest belief that Harman and Victim were not engaging in sex or that Victim consented, "then the prosecution must prove beyond a reasonable doubt that the defendant did not act under an honest belief." The trial court refused to include a mistake-of-fact instruction, concluding that mistake of fact was inapplicable because it would not negate the culpable mental state.

¶ 19 The case was submitted to the jury around 1:40 p.m. on the final day of trial. At 3:30 p.m., the jury submitted a question to

the court regarding Instruction 33. That instruction set forth the elements of rape as an accomplice, explaining that in order to find Defendant guilty of rape as an accomplice, the jury had to find that Defendant "solicited, requested, commanded, or encouraged another to have sexual intercourse with [Victim] without consent; or . . . intentionally aided another to have sexual intercourse with [Victim] without consent." The jury's question was "[D]id [Defendant] have to specifically specify to [Harman] to have sexual intercourse without consent in order for us to be able to agree with the statement?" After hearing from counsel, the trial court answered the jury in the affirmative and referred the jury to the special verdict form. At 4:56 p.m., the jury submitted another question to the court. The jury's second question was "We found a verdict for count 2[, the accomplice liability charge]. We do not have a unanimous decision for count 1. What do we do?" The trial court proposed giving a modified *Allen* instruction [4] (Instruction 37) [5] similar to that approved by this court in *State v. Harry*, 2008 UT App 224, 189 P.3d 98. Although defense counsel objected to some of the language in the instruction, the trial court proceeded to give Instruction 37.

¶ 20 The jury returned guilty verdicts on both counts at 6:28 p.m. On the special verdict form concerning the accomplice liability charge, the jury answered, "Yes," to the first question, "Did Geody Harman have sexual intercourse with [Victim] without her consent?" The second question asked the jury to indicate the basis for its finding that the intercourse between Harman and Victim was nonconsensual. One option was that Victim was fourteen years of age or older, but younger than eighteen years of age, and Harman was more than three years older than Victim and enticed Victim to submit or participate. However, the jury marked the other option,

finding that Victim expressed a lack of consent through words or conduct.[6] *See* Utah Code Ann. § 76-5-406 (LexisNexis Supp. 2013) (enumerating circumstances where a rape is without the consent of the victim, including when "the victim expresses lack of consent through words or conduct" or when "the victim is 14 years of age or older, but younger than 18 years of age, and the actor is more than three years older than the victim and entices or coerces the victim to submit or participate, under circumstances not amounting to . . . force or threat").[7] Defendant timely appeals from his convictions.

## ISSUES AND STANDARDS OF REVIEW

¶ 21 Defendant advances five claims of error on appeal. First, Defendant argues that the trial court exceeded its discretion when it admitted Sister's testimony that Defendant asked her to pose for nude pictures and that she believed Victim's allegations. "[W]e grant a trial court broad discretion to admit or exclude evidence . . . ." *State v. Gallup*, 2011 UT App 422, ¶ 12, 267 P.3d 289 (alteration in original) (citation and internal quotation marks omitted). But even when the trial court has exceeded its discretion in making an evidentiary ruling, we will reverse "only if, absent the error, there is a reasonable likelihood that there would have been a more favorable result for the defendant. A reasonable likelihood of a more favorable outcome exists when the appellate court's confidence in the verdict actually reached is undermined." *State v. Kohl*, 2000 UT 35, ¶ 17, 999 P.2d 7 (citation and internal quotation marks omitted); *see also State v. King*, 2010 UT App 396, ¶ 40, 248 P.3d 984 ("An erroneous decision to admit or exclude evidence does not constitute reversible error unless the error is harmful." (citation and internal quotation marks omitted)).

4. In *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the United States Supreme Court approved the use of supplemental jury instructions to help a deadlocked jury reach a unanimous verdict. *Id.* at 501–02.

5. The instruction is not numbered in the record, but for simplicity, we refer to it as Instruction 37.

6. The parties do not dispute that Victim was a fifteen-year-old minor at the time of the sexual intercourse with Harman, who was in his early thirties.

7. Where recent amendments to the Utah Code do not affect our analysis, we cite the most recent version of the code for the reader's convenience.

¶ 22 Second, Defendant argues that the trial court exceeded its discretion in denying his motion for a mistrial. "The decision to grant or deny a mistrial ... rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion." *State v. Calliham*, 2002 UT 86, ¶ 42, 55 P.3d 573. "We review the trial court's finding that the testimony was not prejudicial and did not warrant a mistrial for abuse of discretion." *Id.* "A defendant has the burden of persuading this court that the conduct complained of prejudiced the outcome of the trial." *State v. Mahi*, 2005 UT App 494, ¶ 10, 125 P.3d 103 (citation and internal quotation marks omitted).

¶ 23 Third, Defendant argues that the trial court erred by refusing to submit a mistake-of-fact instruction to the jury on the accomplice liability rape charge. "Whether the trial court's refusal to give a proposed jury instruction constitutes error is a question of law, which we review for correctness." *State v. Marchet*, 2012 UT App 197, ¶ 10, 284 P.3d 668 (citation and internal quotation marks omitted). "Failure to give requested jury instructions constitutes reversible error only if their omission tends to mislead the jury to the prejudice of the complaining party or insufficiently or erroneously advises the jury on the law." *State v. Stringham*, 2001 UT App 13, ¶ 17, 17 P.3d 1153 (citation and internal quotation marks omitted).

¶ 24 Fourth, Defendant claims that the trial court improperly allowed the State to amend the information during trial. "A trial court's decision to permit amendment of an information is reviewed for abuse of discretion." *State v. Hamblin*, 2010 UT App 239, ¶ 13, 239 P.3d 300.

¶ 25 Finally, Defendant contends that the trial court submitted a coercive *Allen* instruction to the jury. We review for correctness whether the trial court's delivery of a modified *Allen* instruction denied Defendant a fair trial. *See State v. Ginter*, 2013 UT App 92, ¶ 5, 300 P.3d 1278; *State v. Harry*, 2008 UT App 224, ¶ 5, 189 P.3d 98.

## ANALYSIS

### I. Admission of Sister's Cross-Examination Testimony

¶ 26 Defendant first challenges the trial court's decision to allow the State to inquire into whether and why Sister came to believe Victim's abuse allegations. Defendant asserts that Sister's explanation that she now believed Victim's claims because Defendant once asked Sister to pose naked was inadmissible under rules 403, 404, and 608 of the Utah Rules of Evidence. The State counters that the evidence was a proper subject of its cross-examination because Defendant had opened the door during his direct examination when Sister testified, in response to defense counsel's question, that she "didn't believe [Victim]." The State argues that if it had not been permitted to ask Sister whether she still believed Victim's allegations were untrue, "the jury would have been left with the false impression that the victim's own sister still believed that she was lying for the purposes of obtaining Defendant's property—thereby inviting the jury to disbelieve the victim as well." [8]

¶ 27 At trial, Defendant called Sister as his first witness in order to introduce evidence that Victim's drug use gave her a motive to fabricate allegations against Defendant. During Defendant's direct examination of Sister, the following exchange took place:

Q [B]efore [Defendant] got arrested on these charges did [Victim] ever talk to you about any allegations of sexual misconduct by [Defendant], or [Harman]?

A No.

Q After [Defendant] got arrested did you ever talk to her about the allegations?

A (Inaudible).

Q When you say not really, does that mean you did but not too much?

A Yeah, like *I didn't believe her so we didn't really ever[ ] get into talking about it.*

8. The State does not argue that this evidence would have been independently admissible in the absence of defense counsel's opening the door.

Q Did you ever ask her any questions on why she was making allegations?

A No.

Q Did she ever tell you why she was making allegations?

A Only that she (inaudible) that she did want [Defendant] to (inaudible).

Q So she told you that she wanted [Defendant]'s belongings and she wanted them for herself?

A (Inaudible).

Q And did she talk to you about how she's going to accomplish that?

A No.

(Emphasis added.) Before beginning cross-examination, the prosecutor pointed to Sister's testimony that she "didn't believe [Victim]" and requested the trial court's permission to explore the reasons for this testimony and whether Sister still felt the same way. Defense counsel objected, explaining that he never asked Sister for her opinion on Victim's veracity. The trial court agreed with the prosecutor and ruled that the prosecutor's proposed questions were proper in light of Sister's testimony on direct examination. The prosecutor proceeded to cross-examine Sister and to elicit her testimony that her belief in Victim's story is "a little different now" because Defendant had asked Sister to pose for nude pictures.

¶ 28 On appeal, Defendant contends that the trial court exceeded its discretion in determining that he opened the door to Sister's cross-examination testimony. He argues that this testimony should have been excluded as inadmissible character evidence under rule 404(b), *see* Utah R. Evid. 404(b) (providing that evidence of other acts is not admissible to prove a person's character in order to show action in conformity therewith), and that the trial court should have excluded the evidence because its prejudicial effect outweighed its probative value, *see id.* R. 403 (providing that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice). Defendant further argues that Sister's testimony amounted to improper bolstering under rule 608(a). *See id.* R. 608(a); *State v. Adams,* 2000 UT 42, ¶ 14, 5 P.3d 642

(explaining that rule 608(a) generally "bars direct testimony regarding the truthfulness of a witness on a particular occasion" (citation and internal quotation marks omitted)).

¶ 29 While certain evidence may be excludable when "elicited or offered by the prosecution to prove its case-in-chief, the same evidence may not be excludable ... when the responsibility for its introduction may be traced to the defendant." *State v. Barney,* 681 P.2d 1230, 1231 (Utah 1984) (citation omitted) (concluding that defense counsel invited any error by eliciting other acts evidence in cross-examining a witness where the witness's statement "was responsive and within the context of defense counsel's question"); *accord State v. Mahi,* 2005 UT App 494, ¶ 17, 125 P.3d 103 ("A party cannot introduce potentially inflammatory evidence and then later complain when the opposing party attempts to rebut it."); *State v. Ramos,* 882 P.2d 149, 154 (Utah Ct.App. 1994) (holding that the "defendant cannot on appeal attack the admission of the photograph because he himself opened the door to its introduction on cross-examination"). Further, "it is proper to allow as rebuttal any testimony which would tend to dispute, explain or minimize the effect of evidence that has been given by one's opponent," *State v. Sanders,* 27 Utah 2d 354, 496 P.2d 270, 274 (1972), so long as that testimony does not go beyond explaining the witness's responses to the opponent's questions, *see State v. Rhinehart,* 2006 UT App 517, ¶¶ 26–27, 153 P.3d 830 (concluding that hearsay testimony went beyond explaining the witness's responses to defense counsel's cross-examination questions).

¶ 30 But even if the trial court exceeded its discretion in admitting Sister's testimony regarding the nude pictures and her changed opinion of Victim's truthfulness, we will not reverse Defendant's convictions unless our confidence in the verdict is undermined. *See State v. Houskeeper,* 2002 UT 118, ¶ 26, 62 P.3d 444 ("[E]ven if we assume that the evidence was improper, an appellate court will not overturn a jury verdict for the admission of improper evidence if the admission of the evidence did not reasonably [affect] the likelihood of a different verdict.").

Here, the exclusion of Sister's cross-examination testimony would not reasonably have led to a different result. There was abundant other evidence to support Defendant's guilt. For example, Victim and Harman both gave detailed testimony that Defendant spoke to them as their religious leader and encouraged them to act on Harman's "impression" that Harman and Victim should have sex. Both Victim and Harman testified that they complied with Defendant's instructions and had sex. Victim also testified that Defendant told her that "the Lord is pleased with ... what [she had] done with [Harman] but he wants [her] to do it again" with Defendant and that he eventually had sex with her. Harman testified that Victim initially said no on the evening they had sex, and Victim testified that she did not want to have sex with either Harman or Defendant, thereby establishing Victim's lack of consent on both counts. Thus, the prosecution's case was strong.

¶ 31 Moreover, the State presented testimony from Relative and Sibling that was probative of Defendant's mental state. For instance, Relative testified that Defendant had sex with her because he told her, in his role as leader of the church, that Relative "needed to ... be a prostitute in a way" and that having sex with him was "the only way he could help [her]" with her depression. Likewise, Sibling testified that Defendant propositioned her several times and argued with her "over [her] moral status and [her] not listening to the Lord's promptings" when she refused him. This evidence from Relative and Sibling revealed Defendant's religious and sexual manipulation of other church members. Indeed, this evidence was more similar to the charged conduct and potentially more damaging to the defense than Sister's testimony that she came to believe Victim's allegations after Defendant asked her to pose nude.[9] We agree with the trial court that the evidence of Defendant's request for nude pictures was "cumulatively ... a tiny piece of evidence."

¶ 32 Accordingly, the trial court's admission of Sister's cross-examination testimony does not undermine our confidence in the verdict, regardless of whether the trial court exceeded its discretion in determining that Defendant had opened the door. We therefore decline to reverse Defendant's convictions on this basis.

## II. Denial of Defendant's Motion for a Mistrial

¶ 33 Defendant asserts that the trial court exceeded its discretion when it denied his motion for a mistrial. This claim is also based on the admission of Sister's testimony on cross-examination. In denying Defendant's motion for a mistrial, the trial court reasoned that Defendant opened the door to the nude-pictures testimony and that this "tiny piece" of evidence did not undermine the fairness of the proceedings.

¶ 34 A trial court judge "is in an advantaged position to determine the impact of courtroom events on the total proceedings." *State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730. "A trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate ... that a fair trial cannot be had and that a mistrial is necessary in order to avoid injustice." *State v. Pedersen*, 2010 UT App 38, ¶ 17, 227 P.3d 1264 (omission in original) (citation and internal quotation marks omitted). We will not reverse a trial court's denial of a motion for a mistrial "[u]nless the trial court's determination is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948 (citation and internal quotation marks omitted); *see also State v. Milligan*, 2012 UT App 47, ¶ 7, 287 P.3d 1 ("[I]n order to obtain a reversal, the defendant must make some showing that the verdict was substantially influenced by the challenged testimony." (citation and internal quotation marks omitted)).

¶ 35 Both at the trial court and on appeal, Defendant's argument on his motion for a

9. The trial court admitted Relative's and Sibling's testimonies under rule 404(b) because the State offered the evidence for a noncharacter purpose of showing Defendant's modus operandi. On appeal, Defendant does not contest the admission of Relative's and Sibling's testimonies.

mistrial is essentially a rehash of his argument that the trial court exceeded its discretion by admitting Sister's cross-examination testimony. We conclude that any error in the admission of Sister's belief in Victim's allegations and Defendant's interest in nude pictures "is relatively innocuous in light of all the testimony presented." *See Allen*, 2005 UT 11, ¶ 40, 108 P.3d 730. Further, we are not convinced that "the verdict was substantially influenced by the challenged testimony such that [Defendant] cannot be said to have had a fair trial." *See Milligan*, 2012 UT App 47, ¶ 9, 287 P.3d 1 (citations and internal quotation marks omitted). Accordingly, the trial court acted within its discretion in denying Defendant's motion for a mistrial.

### III. Defendant's Proposed Mistake-of-Fact Instruction

¶ 36 Defendant argues that the trial court was obligated to give his proposed mistake-of-fact instruction because evidence was presented in support of his theory, *see State v. Low*, 2008 UT 58, ¶ 25, 192 P.3d 867, and because "mistake of fact which disproves the culpable mental state is a defense to any prosecution," *see* Utah Code Ann. § 76–2–304 (LexisNexis 2012). Defendant's proposed instruction would have instructed the jury that an act committed under ignorance or mistake of fact disproves the culpable mental state and that therefore "it is a defense to the charge of Rape as an Accomplice if the defendant had an honest belief that [Victim] was not being raped." Defendant's proposed instruction further explained that "the prosecution must prove beyond a reasonable doubt that the defendant did not act under an honest belief that Geody Harman and [Victim were] not engaging in sex or that [Victim] was consenting to engage in sex with Geody Harman."

¶ 37 We recently rejected a similar argument in *State v. Marchet*, 2012 UT App 197, 284 P.3d 668. There, a defendant charged with rape requested a jury instruction that would have permitted the jury to acquit if the jury believed that the defendant was ignorant or mistaken in his belief that the victim consented to sex. *Id.* ¶ 18. We concluded that "the arguments and the evidence

supporting [the defendant's] mistake-of-fact defense also support acquittal under the jury instructions provided." *Id.* ¶ 19. We therefore affirmed the trial court's refusal to instruct on mistake of fact because "the instructions properly informed the jury as to the elements and mental state of the crime and allowed the jury to consider [the defendant's] theory of the case." *Id.; cf. State v. Sessions*, 645 P.2d 643, 646–47 (Utah 1982) (concluding that the trial court did not err in refusing a proposed diminished capacity instruction because, in part, the instructions on mens rea and lesser included offenses adequately "gave the defendant whatever benefit defendant would have had, had a diminished capacity instruction been given").

¶ 38 Defendant's mistake-of-fact defense attempts to undermine his mens rea with respect to the element of lack of consent. *See* Utah Code Ann. § 76–2–304; *see also id.* § 76–2–103(3) (stating that the culpable mental state of recklessness relates to the "circumstances surrounding [the defendant's] conduct or the result of his conduct"). In a prosecution for rape as an accomplice, the State is required to prove beyond a reasonable doubt that a defendant acted with "the mental state required for the commission of an offense" and "solicit[ed], request[ed], command[ed], encourage[d], or intentionally aid[ed] another" in committing a crime. *See id.* § 76–2–202. A defendant who acts as an accomplice to rape must undertake his actions intentionally, knowingly, or recklessly. *See id.* § 76–2–102; *id.* § 76–5–402 (Supp.2013); *see also id.* § 76–2–103 (2012) (defining intent, knowledge, and recklessness); *State v. Jeffs*, 2010 UT 49, ¶¶ 44, 49, 243 P.3d 1250 (noting that an accomplice and the principal need not act with the same mental state). A person acts "[r]ecklessly with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Utah Code Ann. § 76–2–103(3).

Under this mental state, the accomplice recognizes that his conduct could result in rape but chooses to proceed anyway.

Thus, in specifying that the accomplice act with the mental state required for the commission of the underlying offense, the accomplice liability statute clearly contemplates that the accomplice is aware of, at a minimum, the substantial and unjustifiable risk that his actions will result in the commission of a crime—in this case rape—by another person.

*Jeffs*, 2010 UT 49, ¶ 45, 243 P.3d 1250. Here, the State was required to prove, at a minimum, that Defendant was aware of the substantial and unjustifiable risk that his actions would result in the commission of a rape by Harman, *see id.*, and that he "solicit[ed], request[ed], command[ed], encourage[d], or intentionally aid[ed]" Harman in committing a rape, i.e., having sexual intercourse with Victim without her consent, *see* Utah Code Ann. § 76-2-202.

 ¶ 39 We affirm the trial court's denial of Defendant's requested mistake-of-fact instruction because "the jury instructions as a whole fairly instruct[ed] the jury on the applicable law." *See Marchet*, 2012 UT App 197, ¶ 17, 284 P.3d 668 (alteration in original) (citation and internal quotation marks omitted). Instruction 33 set forth the required elements for the jury to find Defendant guilty of rape as an accomplice:

1. That the defendant, TERRILL DALTON,

 a. solicited, requested, commanded, or encouraged another to have sexual intercourse with [Victim] without consent; or

 b. intentionally aided another to have sexual intercourse with [Victim] without consent; and

2. acted intentionally, knowingly, or recklessly as to the result of his conduct that another would have sexual intercourse with [Victim] without consent; and

3. That Geody Harman had sexual intercourse with [Victim] without her consent.

Instruction 28 stated, "[T]here must be evidence presented by the State that establishes beyond a reasonable doubt that the defendant engaged in some active behavior, or at least speech or other expression that served to assist or encourage Geody Harman to rape [Victim]." It further instructed, "A person who intentionally aids another person to engage in conduct is one who intends to bring about something planned or foreseen, to have a purpose or design with which an act is done, assists or facilitates the commission of a crime, or promotes the accomplishment of the crime." As in *Marchet*, the instructions given to the jury also further explained consent, reasonable doubt, and the three enumerated mental states. *See id.* ¶ 18. Under these jury instructions, if the jury was convinced that Defendant honestly believed that Victim purported to consent to sex with Harman,[10] the jury could find that the State did not meet its burden to prove beyond a reasonable doubt that Defendant had the requisite mental state—i.e., that Defendant did not, at a minimum, "recognize[ ] that his conduct could result in rape but [chose] to proceed anyway." *See Jeffs*, 2010 UT 49, ¶ 45, 243 P.3d 1250. We therefore conclude that the arguments and the evidence supporting Defendant's mistake-of-fact defense also support acquittal—if believed by the jury—under the instructions provided. *See Marchet*, 2012 UT App 197, ¶ 19, 284 P.3d 668.

¶ 40 Read as a whole, the instructions submitted to the jury properly instructed on the applicable law and allowed the jury to consider Defendant's theory of the case. Accordingly, the trial court did not err in refusing to instruct the jury on mistake of fact.

---

10. As noted, Victim was fifteen years old and Harman was in his thirties when they had sex. *See supra* note 7. Because of this age difference, the jury's finding that Victim expressed her lack of consent through words or conduct went beyond what the law would require. *See* Utah Code Ann. § 76-5-406(11) (LexisNexis Supp. 2013) (providing that an act of rape is without the consent of the victim when "the victim is 14 years of age or older, but younger than 18 years of age, and the actor is more than three years older than the victim and entices or coerces the victim to submit or participate, under circumstances not amounting to ... force or threat"). In affirming the trial court's refusal to instruct the jury on mistake of fact, we acknowledge that the jury could also have found that the sex between Harman and Victim was nonconsensual based on Harman's actions and Victim and Harman's age difference.

## IV. Amended Information

▮ ¶ 41 Next, Defendant argues that the trial court exceeded its discretion when it allowed the State to amend the information during trial. In particular, Defendant asserts that he was prejudiced by the State's amendment to the information because a prior amendment had caused his counsel to abandon his investigation and preparation for an alibi defense.

▮ ¶ 42 At the time of trial, rule 4(d) of the Utah Rules of Criminal Procedure provided, "The court may permit an indictment or information to be amended at any time before verdict if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced." Utah R.Crim. P. 4(d) (2011).[11] Thus, "even if an amended information does create a new and additional offense, reversal is only appropriate if the defendant can demonstrate that his or her substantial rights are prejudiced as a result of the amendment." See State v. Hattrich, 2013 UT App 177, ¶ 39, 317 P.3d 433 (noting that rule 4(d) case law places the burden on the defendant to establish prejudice on appeal); see also Utah R.Crim. P. 30(a) ("Any error ... which does not affect the substantial rights of a party shall be disregarded.").

¶ 43 In this case, the State's amendments did not include "additional or different offense[s]." See Utah R.Crim. P. 4(d). Defendant therefore claims that the trial court exceeded its discretion by permitting the State to alter the dates of the offenses charged in the information because the State's amendment prejudiced his substantial rights. In support of his argument, Defendant asserts that his trial counsel initially began to gather evidentiary support for a potential alibi defense that Defendant could not have committed the charged crimes because Defendant did not live in Utah in September 2005. According to Defendant, his trial counsel abandoned efforts to collect potential witnesses and bank records when the State filed the First Amended Information, which changed the dates of the offenses from September 1, 2005, to early 2005, when Defendant did live in Utah. Defendant claims that permitting the State to change the dates back to September 2005 through January 2006 during trial prejudiced his ability to defend himself because three months earlier his trial counsel stopped preparing his alibi defense for the later offense dates.

▮ ¶ 44 Defendant has not demonstrated that his substantial rights were prejudiced by the State's final amendments to the information. Although a defendant is entitled to have the charges against him "defined with such reasonable clarity that he can mount a defense," State v. Taylor, 2005 UT 40, ¶ 10, 116 P.3d 360 (citation and internal quotation marks omitted), Utah law does not "expressly mandate" that the State identify "the exact date when an alleged offense occurred," id. ¶ 9; see also State v. Gulbransen, 2005 UT 7, ¶ 31, 106 P.3d 734 ("[T]he mere assertion of an alibi defense does not impose on the prosecution the additional burden of proving the precise date of the act. The burden on the prosecution remains the same, i.e., to establish all elements of the crime beyond a reasonable doubt." (citation and internal quotation marks omitted)). Here, the Information was filed in August 2010 and notified Defendant that he was charged with crimes alleged to have occurred around September 1, 2005, with the Information's probable cause statement giving a date range of the crimes as "between September 2005 and January 2006." Further, Victim allegedly testified at the preliminary hearing in April 2011 that the crimes occurred around September when she was between fifteen and sixteen years old, a time frame in the fall of 2005, or, according to defense counsel's interpretation of the preliminary hearing transcript, that the offenses may have occurred as late as December 2005.[12] The First Amended Infor-

11. Shortly after trial, rule 4 was amended to read, in relevant part, "The court may permit an indictment or information to be amended after the trial has commenced but before verdict if no additional or different offense is charged and the substantial rights of the defendant are not preju-diced." See Utah R.Crim. P. 4(d) (amended effective April 1, 2012).

12. Because a transcript of the preliminary hearing is not in the record on appeal, our review is limited to counsel's representations to the trial

mation, filed three months before trial, in January 2012, changed the dates of the conduct to "on or about January 01, 2005 through June 30, 2005." The prosecution later explained this change as stemming from a misreading of Victim's school records. Although the Second Amended Information filed during trial changed the relevant dates in the charges themselves back to "on or about September 2005 through January 2006," Defendant had notice eighteen months before trial that he was charged with crimes committed in late 2005. We therefore agree with the trial court that Defendant had sufficient notice over a long period of time about the general time period involved in the case. In light of Victim's apparent testimony at the preliminary hearing and the unchanging dates in the probable cause statement in each iteration of the information, it would not have been reasonable for him to simply abandon preparations for an alibi defense in response to the First Amended Information.

¶ 45 Furthermore, even accepting Defendant's claim that he was no longer living in Utah at the time of the dates listed in the Second Amended Information, the evidence presented at trial showed that Defendant had the opportunity to commit the crimes in September 2005. Testimony about the details of the two offenses explicitly places Defendant in Utah in late 2005. Furthermore, two witnesses testified that Defendant made trips to Utah during the periods in 2005 when he was living out of state. Friend, who testified for the defense, indicated that Defendant went to Arizona and Nevada in 2005 but that during that time, he periodically came back to Utah. Friend testified that Defendant stayed for a couple days to a week during these visits to Utah. Similarly, Harman's testimony indicated that Defendant traveled "a fair amount of time." In fact, Harman testified that Defendant returned from Nevada for a church conference in Utah in October 2005.[13] Thus, contrary to Defendant's argument that it would have been impossible for him to commit the crimes in late 2005, the evidence showed that Defendant was in Utah at that time and had the opportunity to commit the charged crimes. *Cf. State v. Wilcox*, 808 P.2d 1028, 1033 (Utah 1991) (reasoning that the defendant had not shown any specific harm to his defense resulting from a lack of exact dates and times in the information because "it [was] doubtful that an alibi defense [was] a realistic possibility" when the defendant "had continual contact with the [victim] half of the time" during the period alleged in the information). Defendant has not demonstrated that his substantial rights were prejudiced by the State's midtrial alterations to the information that he claims caused his trial counsel to abandon preparations for his alibi defense.[14]

¶ 46 Accordingly, we conclude that the trial court acted within its discretion when it permitted the State to amend the dates of the charged offenses during trial. Defendant had sufficient notice of the charges against him, and his substantial rights were not prejudiced by the amendment.

## V. *Allen* Instruction

¶ 47 Finally, Defendant contends that the trial court denied him a fair and

court of what took place at the preliminary hearing.

13. Harman also suggested that Defendant had been sexually frustrated in Nevada and that Defendant reported that he had "some relief" by being intimate with Victim.

14. In the alternative, Defendant now asserts that the trial court should have granted him a continuance sua sponte when the State moved to amend the information at trial. We review this claim for plain error because although trial counsel opposed the State's motion to amend, he did not request a continuance below. "[T]o establish the existence of plain error and to obtain appellate relief from an alleged error that was not properly objected to," Defendant must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993). "If any one of these requirements is not met, plain error is not established." *Id.* at 1209. Here, Defendant has not shown any prejudice caused by the claimed error that the trial court committed in not continuing the trial on its own initiative. As we have explained, even if Defendant had had additional time to collect more evidence that he lived in Nevada in late 2005, the evidence also showed that he visited Utah periodically during this time frame and that he had the opportunity to commit the charged crimes. Thus, we conclude that the trial court did not plainly err by not granting Defendant a continuance sua sponte.

impartial trial, in violation of his Sixth Amendment rights, by giving an *Allen* instruction that "coerced jury members to reach a verdict after the jury had informed the judge that they were unable to reach a verdict." "[T]he non-coercive use of *Allen* charges is permitted in Utah because such charges [are] a reasonable and proper exercise of the court's power to guide the jury to a fair and impartial verdict." *State v. Ginter*, 2013 UT App 92, ¶ 6, 300 P.3d 1278 (alterations in original) (citation and internal quotation marks omitted). In determining whether a particular *Allen* instruction is coercive, we "consider [1] whether the language of the supplemental charge can properly be said to be coercive [per se], and [2] whether it is coercive under the specific circumstances of the case." *State v. Harry*, 2008 UT App 224, ¶ 7, 189 P.3d 98 (alterations in original) (citation and internal quotation marks omitted). "Ultimately, the correctness of the charge must be determined by the consideration of the facts of each case and the exact words used by the trial court." *Ginter*, 2013 UT App 92, ¶ 6, 300 P.3d 1278 (citation and internal quotation marks omitted).

¶ 48 "[T]here are certain inherently coercive ideas which should not be included in an *Allen* instruction." *State v. Lactod*, 761 P.2d 23, 31 (Utah Ct.App.1988). For instance, the jury should not be instructed that a criminal case must be decided by a verdict. *Id.*

> Further, the instruction, in the light of the circumstances under which it is given, should not overemphasize the importance of an agreement, suggest that any juror surrender his independent judgment, or say or do anything from which the jury could possibly infer that the court is indicating anxiety for or demanding some verdict, or subjecting the jury to the hardships of long deliberations.

*Id.* (citation and internal quotation marks omitted).

¶ 49 Defendant argues that although the trial court claimed to be giving an *Allen* instruction as approved by this court in *State*

v. *Harry*, 2008 UT App 224, 189 P.3d 98, the instruction that the trial court gave here failed to meet that standard. In support of his argument, Defendant points us to the language approved in *Harry*,[15] and to the American Bar Association's (ABA) version of verdict-urging instructions.

¶ 50 We have held that an *Allen* instruction need not be strictly confined to the ABA model or to the precise language in *Harry* in order to be deemed noncoercive. *See id.* ¶ 26; *Ginter*, 2013 UT App 92, ¶ 13, 300 P.3d 1278 (citing *Lactod*, 761 P.2d at 30–31). In *Harry*, we expressed our preference that Utah trial judges utilize the ABA model instruction, indicating that it is "unlikely that adherence to the ABA language, even after the jury has deadlocked, will be deemed coercive under the circumstances." 2008 UT App 224, ¶ 25, 189 P.3d 98. But while we urged the use of the ABA model, we nevertheless "decline[d] ... to limit [Utah] trial courts to using only the ABA model." *Id.* ¶ 26. Indeed, we have never required any "prescribed ritual of words." *Lactod*, 761 P.2d at 30 (citation and internal quotation marks omitted). Thus, an *Allen* instruction need not precisely conform to the ABA model or to the language approved in prior cases.

¶ 51 Defendant criticizes the language of Instruction 37 in three ways, claiming that it is coercive per se. First, Defendant claims that Instruction 37 "failed to inform the jury that it would be discharged without having agreed upon a verdict if there were no reasonable probability that it would reach one." Again, "there is no prescribed 'ritual of words' indicating whether the language of an *Allen* charge is coercive," *id.* (citation omitted), and the omission of a particular phrase that could have been included in an *Allen* instruction does not necessarily render the instruction coercive, *see State v. Thomas*, 777 P.2d 445, 448 (Utah 1989) (concluding that an instruction was not coercive even though it lacked language "informing the jurors to make a decision based on their independent judgment and according to their

---

15. The court in *Harry* concluded that the *Allen* instruction was coercive under the circumstances of the case, but it held that the instruction itself was not coercive per se. *State v. Harry*, 2008 UT App 224, ¶ 35, 189 P.3d 98.

own consciences"). Although Instruction 37 did not explicitly state that the jury could be discharged if it could not reach a verdict, the instruction conveyed the idea that the jury did not have an absolute duty to reach a verdict. In particular, Instruction 37 stated that "it is your duty to decide this case if you can without yielding your conscientious convictions." Additionally, the instructions given before deliberations advised the jurors to "not give up [their] honestly held views about the evidence simply to agree on a verdict, to give in to pressure from other jurors, or just to get the case over with." The jury was further instructed, "Try to reach unanimous agreement, but only if you can do so honestly and in good conscience." In view of all the instructions given, we are not persuaded that the lack of language stating the jury could be discharged without having reached a verdict renders Instruction 37 coercive per se.

 ¶ 52 Second, Defendant argues that the tone of Instruction 37 was "imperative and obligatory." Specifically, Defendant objects to the language stating, "The verdict to which each of you agree must be your own," and that the jury had a "duty to decide this case." According to Defendant, this language gives no allowance for the possibility of not reaching a verdict. Defendant ignores the qualifying language given to the jury. Instruction 37 stated, as noted above, "[I]t is your duty to decide this case *if you can without yielding your conscientious convictions.*" (Emphasis added.) Moreover, it instructed the jurors, "The verdict to which each of you agree must be your own and the result of your own convictions and not a mere acquiescence in the conclusion of your fellow jurors." This additional language serves to counterbalance any coercive impact the "duty to decide" language might have had if taken in isolation. *See Harry,* 2008 UT App 224, ¶ 12, 189 P.3d 98. Almost identical language was held not to be coercive per se in *Harry. See id.* (" '[I]t is your duty to agree upon a verdict if you can do so without surrendering your conscientious conviction.' " (emphasis omitted)). Again, as noted above, the instructions given before deliberations directed the jury, "Try to reach unanimous agreement, but only if you can do so honestly and in good conscience." The instructions fur-

ther stated, "[I]n the end, your vote must be your own," and "[T]he verdict must reflect your individual, careful, and conscientious judgment as to whether the evidence presented by the prosecutor proved each charge beyond a reasonable doubt." Consequently, we reject Defendant's claim that the "duty to decide" language rendered Instruction 37 coercive per se.

 ¶ 53 Third, Defendant attacks Instruction 37's language referring to "a dissenting juror" and argues that it would have focused undue pressure on any holdout juror. We disagree. Instruction 37 states in part,

> If a larger number of your panel are for conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one if it makes no impression on the minds of so many other jurors who are equally honest and intelligent and have heard the same evidence and taken the same oath. On the other hand, if a larger number of your panel are for an acquittal, the minority should ask themselves whether they ought to reasonably doubt seriously the correctness of judgment which is not concurred in by most of those with whom they are associated, and distrust the weight and sufficiency of that evidence which fails to carry conviction to the minds of their fellow jurors.

This language of Instruction 37 is similar to that used in *Harry.* There, the phrase "each dissenting juror" was used. *Id.* ¶ 17 (emphasis omitted). Although we recognized that "an instruction delivered to a deadlocked jury that is directed only to the minority jurors is more likely to be problematic," we concluded that the instruction as a whole was not coercive per se because it instructed both the jurors in favor of conviction and those in favor of acquittal to reexamine their conclusions. *Id.* ¶¶ 16–18; *see also id.* ¶ 16 n. 8 (collecting cases when *Allen* instructions were deemed not to be coercive per se despite being directed only to minority jurors). In this case, we similarly conclude that Instruction 37 was not coercive per se because it directed minority or dissenting jurors to reexamine their conclusions whether "a larger number of [the] panel" was in favor of or

against conviction. *See id.* ¶¶ 16–18. Accordingly, Instruction 37 contained no inherently coercive language and was therefore not coercive per se.[16]

¶ 54 Defendant also suggests that Instruction 37 was coercive under the circumstances, arguing that by receiving Instruction 37 at nearly 5 p.m., the jury "may well have had the impression that the court was going to require it to deliberate on into the night if necessary until a verdict was reached." The State claims that Defendant did not preserve this coercive-under-the-circumstances argument. Defendant's argument to the trial court regarding Instruction 37 is as follows:

> [DEFENSE]: I've never had to give an instruction like this. If it's been approved [in *Harry* ], I don't know there's much I can argue. The last part there where it talks about conviction—or (inaudible) conviction, I don't personally like that language in both of those but again, if there's case law that's already said this is a good instruction, I don't think there's anything—
> THE COURT: It says (inaudible) large number of your panel for acquittal, so it does both—
> [DEFENSE]: It does both. I personally don't like that language either way but again if the Court says it's approved, then I don't think there's anything I can ...
> THE COURT: I believe it has been....
> [DEFENSE]: If I may, Your Honor, just for preservation, object to just part of this language in the instruction.
> THE COURT: Okay.
> [DEFENSE]: Are we on the record?
> THE COURT: Yes.
> [DEFENSE]: I understand the Court's concern with ... the jury questions. In regards to that, the language in this instruction where it starts off towards the

bottom, "If a larger number of your (inaudible) conviction, the dissenting juror should" and likewise the next sentence which talks about a larger number of [the panel] for acquittal, I would object to that language being included but again, I defer to the Court's judgment.

¶ 55 The preservation requirement applies to constitutional issues. *See State v. Pullman*, 2013 UT App 168, ¶ 27, 306 P.3d 827; *see also State v. Medina*, 738 P.2d 1021, 1023–24 (Utah 1987) (reviewing challenge to an *Allen* instruction only under ineffective assistance of counsel because trial counsel affirmatively stated at trial that she had no objection to the instruction). "Utah courts require specific objections in order to bring all claimed errors to the trial court's attention to give the court an opportunity to correct the errors if appropriate." *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 (citation and internal quotation marks omitted). Therefore, "if a party makes an objection at trial based on one ground, this objection does not preserve for appeal any alternative grounds for objection." *Id.* Here, Defendant did not object in any way to the timing of the instruction. Because Defendant did not raise this specific concern at trial and does not assert any exception to the preservation rule on appeal, we decline to consider the merits of Defendant's coercive-under-the-circumstances argument.

## CONCLUSION

¶ 56 We affirm Defendant's convictions. The admission of evidence that Sister believed Victim's story after Defendant asked Sister to pose for nude pictures did not prejudice Defendant. For the same reason, the trial court did not exceed its discretion in denying a mistrial based on the admission of that evidence. We conclude that the trial

---

16. When the jury informs the judge that it is deadlocked as a result of a single dissenting juror, "the focus of the modified *Allen* charge on that single juror" may "creat[e] the possibility that the holdout juror might have the mistaken impression that she was being directly and individually instructed by the trial judge to defer to the conclusions of the majority." *Harry*, 2008 UT App 224, ¶ 32, 189 P.3d 98. Such situations have contributed to our holdings in prior cases that the giving of *Allen* instructions was coercive under the circumstances. *See id.* ¶¶ 32, 35; *see also State v. Ginter*, 2013 UT App 92, ¶¶ 4, 16, 300 P.3d 1278. Here, the jury did not inform the court of how it was divided, and Defendant did not preserve a coercive-under-the-circumstances challenge to the language referring to "a dissenting juror." *See infra* ¶¶ 54–55.

court did not err by refusing to instruct the jury on mistake of fact because the instructions given to the jury adequately conveyed the applicable law. The trial court acted within its discretion when it permitted the State to amend the information at trial because Defendant's substantial rights were not prejudiced by the amendment. Finally, the modified *Allen* instruction given to the jury in this case was not coercive per se and did not deny Defendant a fair and impartial trial.