**2025 UT App 118**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
HOWELL WILLIAMS,
Appellant.

Opinion
No. 20220495-CA
Filed August 7, 2025

Fourth District Court, Nephi Department
The Honorable Anthony L. Howell
The Honorable Ray M. Harding Sr.
No. 991600013

Benjamin Miller and Debra M. Nelson,
Attorneys for Appellant

Derek E. Brown and Marian Decker,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

OLIVER, Judge:

¶1      In 2000, a jury convicted Howell Williams of murder for killing his wife, whose body was found in rural Juab County in 1991. Over twenty years later, Williams successfully moved to reinstate his right to appeal. Williams now appeals his conviction, arguing that: (1) the trial court[1] committed plain error and his

_____

1. Judge Harding presided over the trial. Judge Howell granted Williams's motion to reinstate his appeal. For simplicity, this opinion uses the "the trial court" when referring to Judge Harding and "the district court" when referring to Judge Howell.

counsel provided constitutionally ineffective assistance at several points during jury selection, (2) the trial court improperly allowed the State to amend the information midtrial, and (3) he is being denied his constitutional right to a meaningful appeal because the transcript from one day of trial is missing and cannot be recreated. We reject Williams's arguments and affirm his conviction.

BACKGROUND

*Discovery of the Body and the Investigation*

¶2 In March 1991, a hunter (Hunter) and his son discovered a deceased female partially concealed in sagebrush in Juab County. They went to a nearby residence and contacted the Juab County Sheriff's Office. Several officers, including the Juab County Sheriff (Sheriff), arrived at the scene. Officers photographed the body and noticed several gunshot wounds to the head along with scratches and bruises on the chest area. The upper left shoulder had a tattoo with the word "Hal's" above a red heart and the word "throb" underneath. Sheriff estimated the woman's body had been in the sagebrush for approximately one month.

¶3 A medical examiner determined the cause of death was eight gunshot wounds to the head. The woman's fingerprints were lifted in May 1992 by a detective from the Millard County Sheriff's Office (Millard Detective), who had specialized training and experience in obtaining fingerprints from bodies exposed to the elements. But officers were not able to identify the woman.

¶4 In February 1999, a detective from the Florida Department of Investigations (Florida Detective) contacted Sheriff. Florida Detective was investigating a missing person who had similarities to the body found in Juab County. The missing person was Barbara Williams (Barbara), Williams's wife. Florida Detective sent Barbara's fingerprints to Juab County for comparison, and Millard Detective determined they were a match.

¶5     Florida Detective discovered that Williams was in a Florida prison and went to interview him. Williams waived his *Miranda* rights and spoke with Florida Detective. Williams stated he had not seen Barbara since 1989 "when he left her in Arizona." Williams also stated that when he married Barbara in 1987, she had four children from a previous marriage and that in 1988 he was accused of molesting one of Barbara's children but the allegation was false and Barbara "put the child up to that." He also told Florida Detective that he fought with Barbara "all the time," that on one occasion she shot him in the right leg with a .22 pistol, and that she owned numerous firearms and he owned none. He also stated he once shot "her in the right eye with a pellet pistol when she jumped on him while he was in bed." Williams denied killing Barbara and said she had no tattoos.

¶6     At the end of the interview, Florida Detective asked Williams if he would speak with investigators from Juab County, and Williams agreed. Sheriff and a deputy from Juab County (Deputy) conducted the interview, which was recorded. Williams continued to deny killing Barbara, but after Sheriff and Deputy informed Williams that they thought he was lying to them and had a warrant to arrest him, Williams confessed to killing Barbara. Williams stated that "things just built up and [he] killed her, [he] shot her," at their apartment in Midvale, Utah. He stated that she was "nagging him and nagging him," and "he just couldn't take it" anymore, so he went to the bathroom with a gun and when Barbara "reached up and grabbed [his] hand" from the bathtub and said "just shoot me you son of a bitch," he shot her "a bunch" of times in the head. Two days later, Williams removed Barbara's body from the bathtub and left it a few hours' drive away.

¶7     After the recording was turned off, Williams stated that there was a written confession in the walls of the Midvale apartment and drew a map of where it was hidden. Investigators found the note using Williams's map. The note stated:

To whom it may concern: My name is Hal Monroe Williams junior. I am on the run from the law in Florida. I've been free for two and half years under an alias name. I have stolen and cheated all of my life. I don't do that now. I have one confession [to] make, I have killed my wife [Barbara]. I shot her in the head nine times while in the bathtub in Midvale, Utah. I left her body about 175 miles south . . . . I am sorry I killed her, but I did not love her. And she was blackmailing me into staying with her. I could no longer fake there, and I snapped. I will never regret my decision ever. This is who I am, I am sorry.

¶8   In March 1999, the State of Utah charged Williams with aggravated murder, a capital felony, in the Fourth District Court, Nephi Department. The State later amended the charge to murder, a non capital felony.

*Preliminary Hearing*

¶9   At the preliminary hearing, the State called Hunter and several law enforcement officers involved in the investigation. After the State rested, Williams's attorney (Counsel) moved the trial court to bind over Williams on a manslaughter charge because Williams was "under the influence of extreme emotional disturbance." The trial court denied the motion. Williams then elected to testify.

¶10   Williams testified about his physical and volatile relationship with Barbara, and described her as a tall, strong, athletic woman with military training. He discussed the incident when he shot Barbara with the pellet gun. He also testified about Barbara shooting him with a .22 rifle. He also stated that Barbara told him she had manipulated her children into making the molestation allegations against him.

¶11   Williams also testified about the day of the shooting. He said that after he got home from work, Barbara accused him of

being unfaithful and told him to leave, but that he would never "get rid of [her]." Williams testified he got a gun from the bedroom, walked into the bathroom where Barbara was in the bathtub, and threatened to shoot her. Barbara grabbed Williams's hand and the gun and said, "I don't think you even got the balls to pull the trigger," and called him "a son-of-a-bitch or a bastard or something." Williams said the gun then went off, but he did not make "a conscious decision to pull the trigger" and it took him an hour to realize that Barbara had been shot. He also testified that if Barbara had not grabbed the gun he probably would not have pulled the trigger.

¶12 On cross-examination, Williams admitted that he felt trapped in his relationship and that he had tried leaving Barbara before. Williams also admitted that he pushed Barbara a few days earlier, which led to the bruises on her chest.

¶13 On redirect, Williams testified that he did not go into the bathroom with the plan of killing Barbara and Barbara was physically capable of deflecting the gun and disabling him if she wanted to, but instead she was the one who moved the gun to her head. Williams also testified that he was very stressed during this time and felt "extremely emotionally disturbed" both during his argument with Barbara and after he shot her. Counsel renewed his motion to have the court bind over Williams on manslaughter rather than murder, which the court denied.

*Jury Selection and the Court's Instructions*

¶14 During jury selection, the trial court asked the potential jurors if any of them were familiar with the prosecutor or any of the State's witnesses, including Sheriff. Several of the potential jurors stated that they knew Sheriff. Juror 6 stated, "I know [Sheriff]. He got my boys out of a few little scrapes when they were younger." When asked if her association with Sheriff "would make it difficult for [her] to act fairly and impartially," Juror 6 responded, "No, he's a friend." The trial court did not ask any additional follow-up questions, and Counsel did not ask to

remove Juror 6 for cause or use a preemptory strike on Juror 6, who was ultimately seated on the jury. Counsel did make a for cause objection to a different potential juror, who was not seated on the jury.

¶15 The trial court informed the potential jurors that this was a murder case and asked if any of them felt they could not be fair and impartial due to the nature of the case. One potential juror raised her hand, and in response to her comments that are not clear in the record, the trial court stated:

> This is not a capital murder case, this is not one in which the Defendant upon a finding of guilty could be sentenced to death. This is a case in which the penalty, which you are not to be concerned with, would be that of five years to life in the Utah State prison. It is a first degree felony.

Counsel did not object.

¶16 After the jury was sworn in, the trial court told the jury that they would hear

> opening statements from the attorneys, first the state, and then the Defendant. And then we'll have a presentation of evidence by the state. At the conclusion of their evidence, then the Defendant will set forth their evidence in the case. If the state has any rebuttal evidence they would like to submit, . . . they can do so at the conclusion of the defense case. . . . We'll then have the closing arguments, first from the state, then from the Defendant and finally a rebuttal from the state.

### Jury Trial

¶17 The State gave its opening statement, but Counsel reserved the defense's opening statement until the end of the State's case.

The State called Hunter, Sheriff, Deputy, Florida Detective, and Millard Detective as witnesses, all of whom testified consistent with the facts described above. During the cross-examination of Deputy, he affirmed that Williams stated he was "in a very distressed state of mind" and "was messed up for two or three days" after he shot Barbara.

¶18 No transcript exists of the second day of the trial because it was destroyed in accordance with the court's record retention policy. Based on the minutes, the following occurred: before the jury was brought into the courtroom, the trial court held a conference in chambers because the State had filed a second amended information clarifying that the murder occurred in Salt Lake County but that "venue is proper because of the body being found in Juab County." Counsel objected, but the trial court approved the second amended information.

¶19 The State then called the medical examiner to testify. The State recalled Sheriff, but Counsel objected. The trial court ruled that the testimony was premature at that point but would be allowed if Williams did not testify. The State rested. Counsel moved to dismiss the charges, which the trial court denied. Counsel made his opening statement. Williams then testified. The defense rested without calling any other witnesses.

¶20 The trial court read the jury instructions to the jurors, which included the following:

> In arriving at a verdict in this case, you shall not discuss nor consider the subject of penalty or punishment, as that is a matter which lies with the court . . . . The penalty and punishment for the crime charged must not in any way affect your decision as to the guilt or innocence of the defendant.

The jury was also instructed that Williams was "presumed to be innocent" unless the jury was satisfied beyond a reasonable doubt of his guilt and that it was the State's burden to prove "beyond a

reasonable doubt the essential elements" of murder. The trial court also instructed the jury on the lesser-included offense of manslaughter. The parties then gave their closing arguments.

¶21    On June 5, 2000, the jury found Williams guilty of murder. Williams was sentenced to five years to life, to run concurrently to any other sentence.

*Post-trial Litigation*

¶22    Counsel timely filed a notice of appeal, but the appeal was dismissed because Counsel did not file a docketing statement. In 2002, Williams wrote a letter to Counsel (and sent a copy to the trial court) asking why his appeal was dismissed for failure to file a docketing statement.

¶23    By 2014, Williams had completed his Florida sentence and was incarcerated in the Utah State Prison. After his return to Utah, Williams filed two pro se sentencing challenges under rule 22 of the Utah Rules of Criminal Procedure, one in 2014 and another in 2021, that were both denied. Then, in October 2021, Williams moved pro se to reinstate his right to appeal. Williams was appointed counsel, and the district court reinstated his right to appeal in May 2022.

ISSUES AND STANDARDS OF REVIEW

¶24    Williams raises several issues on appeal. First, Williams contends the trial court plainly erred, and Counsel was ineffective, at several points during jury selection. "Claims for plain error and ineffective assistance of counsel present questions of law, which we evaluate for correctness." *State v. Samora*, 2022 UT App 7, ¶ 16, 504 P.3d 195.

¶25    Next, Williams asserts the trial court improperly allowed the State to amend the information midtrial. "A trial court's decision to permit amendment of an information is reviewed for

abuse of discretion." *State v. Dalton*, 2014 UT App 68, ¶ 24, 331 P.3d 1110 (cleaned up).

¶26 Finally, Williams argues he is being denied his constitutional right to a meaningful appeal because the State is unable to provide him with a complete record of the second day of trial. Because there is no ruling to review, we decide this issue in the first instance and no standard of review applies. *See Vote Solar v. Public Service Comm'n*, 2023 UT 13, ¶ 22, 532 P.3d 981 (holding that "no standard of review applies" when an appellate court is deciding an issue in the first instance with no previous ruling to review).

ANALYSIS

I. Plain Error and Ineffective Assistance of Counsel

¶27 Williams raises several unpreserved claims on appeal that he asks us to review for plain error and ineffective assistance of counsel. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful." *State v. Broadwater*, 2024 UT App 184, ¶ 33, 562 P.3d 739 (cleaned up), *cert. denied*, 564 P.3d 959 (Utah 2025). And to "demonstrate ineffective assistance of counsel," Williams must show both "that his counsel's performance was objectively deficient" and "that the deficient performance prejudiced the defense." *State v. Herrera*, 2025 UT App 1, ¶ 16, 563 P.3d 416 (cleaned up); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984) (articulating the two-pronged test for evaluating claims of ineffective assistance of counsel).

¶28 "Although plain error and ineffective assistance of counsel are distinct concepts, they each require the defendant to demonstrate that the alleged error or deficiency resulted in prejudice." *State v. Haar*, 2021 UT App 109, ¶ 53, 500 P.3d 102 (cleaned up). And "the prejudice analysis is the same under both a plain error and ineffective assistance of counsel framework." *Id.* (cleaned up). Thus, to "succeed under either framework,

[Williams] must show that there is a reasonable probability that but for the alleged errors, the result of the proceeding would have been different." *Id.* ¶ 54 (cleaned up). As explained below, Williams fails to carry his burden.

A.     Juror 6

¶29     Williams asserts that Counsel was deficient for failing to request removal of Juror 6 for cause after she admitted Sheriff was a "friend" who "got [her] boys out of a few little scrapes." In determining whether Counsel's performance was deficient we "indulge a strong presumption that Counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Marquina*, 2018 UT App 219, ¶ 37, 437 P.3d 628 (cleaned up). This presumption is only overcome "if there is a lack of any conceivable tactical basis for Counsel's actions." *Id.* (cleaned up). "Because jury selection is more art than science," Counsel "is given an especially wide berth with regard to jury selection and retention." *Id.* (cleaned up).

¶30     Due to the subjective nature of jury selection, "appellate review becomes an inherently speculative exercise"; thus, appellate courts must "presume that [C]ounsel's lack of objection to, or failure to remove, a particular juror was the result of a plausibly justifiable conscious choice or preference." *State v. Litherland*, 2000 UT 76, ¶¶ 24–25, 12 P.3d 92. To rebut this presumption, Williams must show the following:

> (1) that defense [C]ounsel was so inattentive or indifferent during the jury selection process that the failure to remove a prospective juror was not the product of a conscious choice or preference; (2) that a prospective juror expressed bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror; or (3) that there is some other specific evidence clearly demonstrating that [C]ounsel's choice was not plausibly justifiable.

*Id.*¶ 25. We address each in turn.

¶31 First, from our review of the jury selection transcript, it is clear that Counsel was not "so inattentive or indifferent" during jury selection that his performance was deficient. *Id.* Counsel participated in three bench conferences during jury selection and made a for-cause challenge to a different potential juror. Thus, Counsel actively participated in the jury selection process.

¶32 Second, while Juror 6 did refer to Sheriff as "a friend," nothing we can discern from the transcript demonstrates that this comment was an expression of "bias so strong or unequivocal that no plausible countervailing subjective preference could justify failure to remove that juror." *Id.* It is impossible for us to assess Juror 6's tone when she said, "No, he's a friend," and we cannot observe her demeanor, personality, interactions with others in the courtroom or any other subtle factors that may have swayed Counsel to believe Juror 6 would be responsive to Williams's case. *See id.* ¶ 21. Therefore, Juror 6 calling Sheriff "a friend" after affirming that she would be able to act "fairly and impartially" is not an expression of "bias so strong or unequivocal" that "no plausible" reason could justify failing to move to remove her for cause. *Id.* ¶ 25.

¶33 Finally, Williams argues that Counsel's history and general reputation of being an inattentive attorney demonstrate that Counsel performed deficiently here. We are not persuaded that just because others may have believed that Counsel had been inattentive in the past means that Counsel was inattentive here. As discussed earlier, *see supra* ¶ 31, from our view of the transcript, Counsel was attentive and engaged in the jury selection process. Therefore, Williams has not rebutted the presumption that Counsel's decision not to remove Juror 6 was a conscious choice or preference.

¶34 In the alternative, Williams asserts that the trial court should have sua sponte dismissed Juror 6 for cause. To prevail on his plain error claim, Williams "must show an error occurred that

should have been obvious to the trial court and that prejudiced the outcome of his trial." *Litherland*, 2000 UT 76, ¶ 31. Only in the rarest circumstances—"where a juror expresses a bias or conflict of interest that is so strong or unequivocal as to inevitably taint the trial process"—is it appropriate for a trial court to interfere with an attorney's "conscious choices in the jury selection process." *Id.* ¶ 32. And as explained above, *supra* ¶ 32, Juror 6's responses did not rise to that level. Therefore, the trial court did not plainly err by not sua sponte dismissing Juror 6.

B.      Informing the Jury of the Penalty for Murder

¶35     Williams argues it was plain error for the trial court to tell the jury that Williams was charged with a first-degree felony and faced a sentence of five years to life if convicted. We agree that the trial court obviously erred in doing so.[2] *See State v. Cesspooch*, 2024 UT App 15, ¶¶ 10–11, 544 P.3d 1046 (holding that it was obvious error "to inform a jury of the classification for an offense" based on longstanding caselaw dating from the 1990's), *cert. denied,* 550 P.3d 994 (Utah 2024). Accordingly, we address this issue on prejudice. And we do so along with another unpreserved claim asserted by Williams, discussed *infra* ¶ 36, to assess whether there was cumulative prejudice. *See infra* ¶¶ 37–42.

C.      Informing the Jury that the Defense Would Set Forth Evidence

¶36     Williams also argues that the trial court plainly erred, and Counsel was ineffective for not objecting, when the trial court told the jury the defense "will set forth their evidence in the case" because the defense does not have to put on any evidence and the burden of proof in a criminal case "rest[s] entirely with the State." Because "plain error and ineffective assistance of counsel share a common standard of prejudice, if we determine that [Williams] is unable to make his showing on prejudice grounds, lack of

---

2. Because we agree that the trial court made an obvious error, we assume that Counsel performed deficiently by not objecting.

prejudice will prove fatal to each of his claims." *State v. Haar*, 2021 UT App 109, ¶ 53, 500 P.3d 102 (cleaned up). We therefore elect to address this claim on prejudice and do so on a cumulative basis in the next subsection.

D.    Prejudice

¶37    We have identified two instances above where we have either determined or assumed that the trial court made an obvious error and Counsel's performance was deficient. *See supra* ¶¶ 35–36. We now consider whether these two instances cumulatively prejudiced Williams.[3] *See State v. Campos*, 2013 UT App 213, ¶ 61, 309 P.3d 1160.

¶38    To reverse under the cumulative error doctrine, this court "must determine that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines its confidence in the outcome." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038. Having determined or presumed for purposes of our analysis that both of the trial court's statements

---

3. In his briefing, Williams also provides a list of Counsel's alleged "shortcomings" in addition to the claims of ineffective assistance addressed above. But Williams does not attempt to meaningfully analyze why Counsel was deficient in each instance or why the deficient performance prejudiced the defense. Therefore, because Williams has not adequately briefed why this additional conduct demonstrates deficient performance under *Strickland*, we decline to include it in our cumulative prejudice analysis. *See State v. Millard*, 2010 UT App 355, ¶ 25, 246 P.3d 151 (holding that an ineffective assistance claim was inadequately briefed when defendant made "no attempt to present a meaningful analysis of the *Strickland* test"); *State v. Schwenke*, 2007 UT App 354U, para. 7 (holding defendant's claims were inadequately briefed when defendant "merely list[ed] defense counsel's alleged failings and conclude[d] that the various failings constitute[d] ineffective assistance").

to the jury were obvious errors, that Counsel's failure to object was an error, and that each error, standing alone, had a "conceivable potential for harm" we therefore evaluate whether the cumulative effect of these two errors undermines our "confidence in the outcome." *Id.* In assessing whether Williams was prejudiced, we consider "a hypothetical—an alternative universe in which the trial went off without the error[s]." *State v. Garcia-Flores*, 2021 UT App 97, ¶ 27, 497 P.3d 847. And in doing so, we are not convinced that there was "a reasonable probability that the verdict would have been more favorable" for Williams. *See State v. Apodaca*, 2019 UT 54, ¶ 53, 448 P.3d 1255 (cleaned up).

¶39 First, even if Counsel objected when the trial court informed the potential jurors of the possible punishment or the trial court realized its error, the trial court likely would have given the potential jurors an instruction to not concern themselves with the possible punishment and included a jury instruction stating the same, which is exactly what happened here. In the same sentence where the trial court mentioned the possible penalty, the trial court stated that the potential jurors were "not to be concerned with" the possible penalty. In addition, jury instruction 25 reiterated,

> In arriving at a verdict in this case, you shall not discuss nor consider the subject of penalty or punishment, as that is a matter which lies with the court . . . . The penalty and punishment for the crime charged must not in any way affect your decision as to the guilt or innocence of the defendant.

The trial court's two statements to the jury that they were not to concern themselves with punishment were adequate in this case to dispel any prejudice. *See State v. Blubaugh*, 904 P.2d 688, 701 (Utah Ct. App. 1995) (holding that "an inadvertent mention of punishment to the jury" was cured by giving a limiting instruction after the comment and giving a jury instruction that informs the jury that they were not to be concerned with potential punishment). Indeed, even if Counsel had objected or the trial

court had realized its error, it is not clear what more Williams believes the trial court should have done to prevent prejudice.

¶40    Next, even if the trial court had not made the statement that the defense "will set forth their evidence in the case" or Counsel had objected, there is no reasonable likelihood of a different outcome. Indeed, it is difficult to see how this statement had any substantive impact when Williams did, in fact, testify. And it is likewise difficult to envision a scenario where Williams does not testify. One of the clear defense strategies during trial was arguing that, although Williams killed Barbara, he was guilty of manslaughter instead of murder. Without Williams's testimony to explain his side of the story and what was going through his head at the time of the killing, it seems highly unlikely that the jury would have found Williams was "under the influence of extreme emotional disturbance" such that the killing was manslaughter rather than murder. Therefore, because Williams's testimony was essential to support the defense's theory that Williams was guilty of manslaughter rather than murder and, more importantly, because Williams did in fact testify, the trial court's statement that the defense "will set forth their evidence" was not prejudicial. We are thus not persuaded that the trial court telling the jury ahead of time that the defense would put on evidence caused the jury here to believe that the burden of proof had shifted to Williams.

¶41    And even if we consider these two errors cumulatively, the jury would still hear strong evidence that Williams killed Barbara and that the killing was murder, not manslaughter. The jury would have heard testimony that during his interview with Sheriff and Deputy, Williams admitted to shooting Barbara in the head "a bunch" of times and said that he moved her body to rural Juab County two days later. The jury also would have also been informed of Williams's written confession where he stated, "I have killed my wife [Barbara]. I shot her in the head nine times while in the bathtub in Midvale, Utah. I left her body about 175 miles south," and that he would "never regret [his] decision." Additionally, Williams presented no compelling evidence of extreme emotional distress to support the lesser included offense

of manslaughter. Rather, he confessed contemporaneously in writing that he simply "snapped."

¶42 Accordingly, we see no reasonable probability that Williams would have been acquitted or convicted of manslaughter rather than murder absent these errors and our confidence in the outcome has not been undermined. *See State v. Campos*, 2013 UT App 213, ¶ 61, 309 P.3d 1160.

## II. Amendment of the Information

¶43 Williams argues the trial court exceeded its discretion when it allowed the State to amend the information midtrial, because the amendment altered the offense and prejudiced his substantial rights. We disagree.

¶44 An information can be amended after trial has commenced but before the verdict "if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced." Utah R. Crim. P. 4(d). However, even if the amendment creates "a new and additional offense," we only reverse if the defendant demonstrates that the amendment prejudiced his substantial rights. *State v. Dalton*, 2014 UT App 68, ¶ 42, 331 P.3d 1110 (cleaned up).

¶45 Williams first asserts that the amendment altered the charged offense because, even though jurisdiction is not an element of the crime, the State "must establish the existence of jurisdiction by a preponderance of the evidence." The State disagrees and argues that the amendment did not include an "additional or different offense." (Quoting Utah R. Crim. P. 4(d).) Rather, the State asserts, the amendment "merely conformed the information to evidence that Williams killed Barbara in Salt Lake County rather than in Juab County." We question whether amending the information to change the location of the alleged killing altered the offense Williams was charged with, but even if changing the location did constitute charging Williams with an "additional or different offense," Williams has not shown that his

substantial rights were prejudiced. Utah R. Crim. P. 4(d); *see also Dalton*, 2014 UT App 68, ¶ 42.

¶46    Williams argues the amendment prejudiced his substantial rights because Counsel prepared to defend against a crime that occurred in Juab County, not a crime that occurred in Salt Lake County. He asserts that Counsel's only "decipherable defense strategy on day one" of the trial was establishing that the crime did not happen in Juab County as charged, so forcing him to change his strategy midtrial prejudiced his substantial rights. We are not persuaded.

¶47    During the preliminary hearing, which was held nine months before trial, Detective testified that Williams said he shot Barbara in their Midvale apartment and then a few days later drove Barbara's body to the desert. After the State presented its witnesses in the preliminary hearing, the trial court discussed with Counsel and the State how it seemed that the killing occurred in Salt Lake County and then Barbara's body was brought to Juab County after she was killed. Then Williams himself testified during the preliminary hearing that he shot Barbara while she was in the bathroom in their apartment, which was located in Midvale. Therefore, nine months before trial, both Williams and Counsel had notice that all involved parties understood the killing occurred in Salt Lake County. *See Dalton*, 2014 UT App 68, ¶ 44 (holding the defendant had sufficient notice and his substantive rights were not prejudiced when the dates on the information were amended midtrial because the amended dates in the information aligned with the dates the victim testified to in the preliminary hearing).

¶48    Additionally, the transcript for the first day of trial demonstrates that Counsel had more than one strategy. During his cross-examination of Deputy, Counsel asked if Williams appeared "to be genuinely sorry about the death of his wife," and Counsel elicited testimony from Deputy that Williams told him he was in a "very distressed state of mind" when the killing occurred and that his relationship with Barbara was "abusive."

And during the cross-examination of Florida Detective, Counsel asked questions about whether he substantiated Williams's statements that Barbara owned several guns and that she had once shot Williams. These questions show that Counsel did not rely solely on the "gotcha" defense that the murder occurred in a different county.

¶49 Counsel's strategy of demonstrating to the jury that Williams did not have the requisite mental state for murder such that the jury should convict him of manslaughter was not impacted by the State amending the information midtrial. And, critically, because Counsel deferred his opening statement until the close of the State's case, Counsel was able to present his opening and the entirety of his case in chief knowing that the information had been amended. Thus, Counsel was able to frame his arguments and strategy accordingly. Therefore, we conclude that Williams's substantial rights were not prejudiced by the State amending the information midtrial.[4]

### III. The Trial Transcript

¶50 Williams asserts that he is "being denied his constitutional right to meaningful appellate review" because a complete record

---

4. Williams alternatively asserts that Counsel was ineffective because he did not request a continuance or new preliminary hearing. But considering that during the preliminary hearing the State elicited testimony, and the trial court discussed, that the killing likely occurred in Salt Lake County, not Juab County, it is unclear what new evidence would be obtained in a new preliminary hearing. Further, it was reasonable for Counsel to believe a continuance would not be helpful when he had already begun eliciting testimony from the State's witnesses to support his argument that Williams—who confessed multiple times to shooting Barbara in the head—was guilty of manslaughter rather than murder. Therefore, Counsel's performance was not deficient in failing to request a new preliminary hearing or a continuance, and Williams's ineffective assistance claim fails.

of the second day of his trial is unavailable. And because the record is not complete, Williams contends we must presume error and reverse his conviction. We disagree.

¶51    The Utah Constitution recognizes a "right to appeal in all [criminal] cases." Utah Const. art. I, § 12; *see also State v. Verikokides*, 925 P.2d 1255, 1256 (Utah 1996). And our supreme court has explained that the "almost complete absence of a trial transcript makes appellate review impossible." *Verikokides*, 925 P.2d at 1256. But Utah courts have not presumed prejudice in all cases where a trial record was missing. *See id.* at 1258 (denying a new trial where the record for the second day of the jury trial was unavailable); *State v. Morello*, 927 P.2d 646, 649 (Utah 1996) ("[W]e do not presume error simply because the record is unavailable."); *State v. Russell*, 917 P.2d 557, 559 (Utah 1996) (holding the defendant was only entitled to new trial when "the missing record might reveal some error"). Rather, Utah courts have presumed prejudice only in certain factual situations. *See State v. McClellan*, 2009 UT 50, ¶ 27, 216 P.3d 956 ("On the specific facts of the defendant's case, . . . we will presume prejudice.").

¶52    In *McClellan*, the defendant alleged that the Utah County Attorney's Office should have been disqualified because his former defense counsel accepted a position at the Utah County Attorney's Office before trial. *Id.* ¶ 19. The supreme court found the trial court erred when it failed to make the disqualification. *See id.* ¶ 26. And the supreme court also concluded that McClellan was not required to demonstrate that he was prejudiced by the error because the "egregious mismanagement of [the] case"— including the destruction of much of the trial record and exhibits—compelled a presumption of prejudice. *Id.* ¶¶ 27, 34. This included delay by the trial court of "almost three years before transferring his file to the appellate court and his defense counsel never fil[ing] a brief on his behalf," and then even after the court attempted to remedy this by resentencing McClellan, he was not informed of the order for resentencing despite being represented by counsel. *Id.* ¶¶ 27–28.

¶53   Relying on *McClellan*, Williams argues we should presume prejudice because part of the trial record is missing. We decline to do so on the facts of this case. Here, Williams does not identify a specific issue or error that he thinks exists in the missing record. Instead, Williams argues that because he believes that Counsel performed deficiently on the first day of trial, it is likely that Counsel also performed deficiently on the second day of trial. But a complete trial record is not required "so appellate counsel can go fishing for error"; the record need only be "adequate to review specific claims of error already raised." *Russell*, 917 P.2d at 559.

¶54   Here, only two witnesses testified during the second day of trial. The State called the medical examiner and then recalled Sheriff, who did not provide further testimony. Williams testified and was the sole witness for the defense. Because Williams presumably knows what he testified to, Williams is, in effect, only missing the transcript for a single witness, who testified for less than forty-five minutes. Therefore, the record here is far less incomplete than in *Verikokides*, where the supreme court denied a new trial despite the record missing "the testimony of many of the prosecution's witnesses, including the victim's testimony, and all of the testimony of the defense witnesses." 925 P.2d at 1255. Accordingly, a new trial is not necessary where Williams has failed to identify a specific issue or error that requires the complete record for appellate review.

¶55   Finally, Williams's conduct here "indirectly resulted in the impossibility of appellate review." *Id.* at 1257. Williams knew in 2002 that his appeal was dismissed for failure to file a docketing statement, and he has not suggested any reason why he was unable to file his motion to reinstate his appeal until nineteen years later. *See Morello*, 927 P.2d at 648 (holding the defendant bore the risk of loss of the transcript when he delayed filing his motion for twelve years). And it is clear that Williams knew how to file a pro se motion; after he completed his Florida sentence and returned to Utah, he filed pro se motions in 2014 and 2021 challenging his sentence.

¶56 Accordingly, even though Williams was not represented by counsel, it is clear from the record that he knew in 2002 that his appeal was dismissed without being considered on the merits and that he knew how to file a pro se motion as early as 2014. This case is therefore distinguishable from the facts in *McClellan* where the defendant was "unaware he had been resentenced and was once again able to exercise his right to appeal," and was repeatedly harmed by his attorneys' mistakes. 2009 UT 50, ¶¶ 13, 27–28.

¶57 Even though Williams's actions did not directly cause destruction of the transcript of the second day of the jury trial, his nineteen-year delay in filing his motion to reinstate his appeal "greatly increased the risk and . . . likelihood that [the] records would be lost or destroyed," because the risks of trial participants becoming unavailable and documents being destroyed following the normal course of recordkeeping increase with the passage of time. *Verikokides*, 925 P.2d at 1257. Therefore, Williams failed to vigilantly preserve his appeal rights and his conduct "indirectly resulted in the impossibility of appellate review."[5] *Id.* at 1257–58. Thus, we decline to presume prejudice, and we deny Williams's request for a new trial.

CONCLUSION

¶58 Williams has not carried his burden of demonstrating that the trial court plainly erred or Counsel provided constitutionally ineffective assistance. Williams has also not demonstrated that the midtrial amendment of the information prejudiced him. Finally, Williams has not shown that he was denied his right to a

---

5. We note that if we presumed prejudice in all cases where any part of the transcript or record was destroyed according to normal recordkeeping procedures, we could potentially be incentivizing defendants to sit on their hands and wait to move to reinstate their right to an appeal until after the record is likely destroyed so they would be granted a new trial. We therefore decline to expand the presumption of prejudice here.

meaningful appeal because the transcript of the second day of trial is missing. We therefore affirm Williams's convictions.

_____