**2025 UT App 133**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CORY JASON THOMAS,
Appellant.

Opinion
No. 20230910-CA
Filed August 28, 2025

Second District Court, Ogden Department
The Honorable Noel S. Hyde
No. 211900875

Hannah Leavitt-Howell and Jessica Hyde Holzer,
Attorneys for Appellant

Christopher F. Allred and Benjamin Gabbert,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

HARRIS, Judge:

¶1      A jury convicted Cory Jason Thomas of failure to stop at the command of a law enforcement officer, interference with a law enforcement officer, and obstruction of justice. The charges stemmed from an interaction between Thomas and a police officer who was in the process of arresting Thomas's girlfriend. Thomas now appeals his convictions, challenging the trial court's decision to sustain an objection to a question his attorney wanted to ask during cross-examination of the officer, and asserting that the court plainly erred by telling the jury that the charged offenses were misdemeanors. For the reasons discussed, we reject Thomas's arguments and affirm his convictions.

BACKGROUND[1]

¶2     At the time of the events in question, Thomas was in a relationship with a woman (Girlfriend) who was on parole and was considered a "parole fugitive." Police officers were actively attempting to apprehend Girlfriend, and one officer (Officer) had noticed that Girlfriend's car was parked at Thomas's residence. Eventually, Officer observed Girlfriend get into her car and begin to drive away from Thomas's house, but before she got very far, she crashed into a "brick partition" on Thomas's property and came to a stop. At that point, Officer activated his emergency lights and began the process of arresting Girlfriend: he put her in handcuffs, searched her, and placed her in his police car.

¶3     Girlfriend then called out for Thomas, "yelling" for him to come outside. When Thomas emerged from the house, Officer first asked him if he wanted police "to take any action" regarding Girlfriend damaging the brick partition, and Thomas answered in the negative. Girlfriend then "began yelling" for Thomas to "grab . . . her purse out of the car." Officer "instructed [Thomas] not to do so, to not touch the car or anything in it." Thomas then walked toward the car, prompting Officer to repeat the instruction "several times." Thomas continued to ignore that admonition, and he proceeded to "pull[] [Girlfriend's] purse out of the" car.

¶4     At this point, Officer moved toward Thomas, "knocked the purse out of his hand," and informed Thomas that "he was now under arrest for obstruction." As Officer was placing Thomas under arrest, Thomas resisted and started to walk "a short

---

1. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Broadwater*, 2024 UT App 184, n.1, 562 P.3d 739 (cleaned up), *cert. denied*, 564 P.3d 959 (Utah 2025).

distance" away from Officer. Thomas turned back and faced Officer, at which point Officer "pulled out [his] department-issued taser." Thomas then "ran up his front steps and went into his house." At some point that day, law enforcement personnel searched Girlfriend's purse, but they found no contraband.

¶5      Later, the State filed three criminal charges against Thomas related to this incident: failure to stop at the command of a law enforcement officer, a class A misdemeanor; interference with an arresting officer, a class B misdemeanor; and obstructing justice, a class A misdemeanor.

¶6      The case proceeded to a jury trial. After the jury was selected but before the presentation of evidence, the trial court issued an initial set of instructions to the jury. During that process, the court read the charging document to the jury, and in so doing, the court told the jury the level of each charged offense. In particular, the court stated that Thomas had been charged with "Count I, failure to stop at the command of a law-enforcement officer, a Class A misdemeanor," "Count II, interference with an arresting officer, a Class B misdemeanor," and "Count III, obstructing justice, a Class A misdemeanor." Just a minute or two later, in reading its preliminary instructions, the court repeated the offenses and their classifications, again telling the jury, "The defendant is charged with the crimes of failure to stop at the command of a law-enforcement officer, a Class A misdemeanor; interference with an arresting officer, a Class B misdemeanor; and obstructing justice, a Class A misdemeanor."

¶7      Thereafter, the State presented its case-in-chief, and it called Officer as its only witness; he testified to the events as described above. In addition, Officer described the process for searches incident to arrest, as well as his department's policies for impounding a car and conducting an inventory search of the car. Officer testified that a search incident to arrest consists of "a search of [an arrestee's] person" as well as "any purses or

backpacks" the arrestee has "on them." Officer stated that after such a search is conducted, the arrestee is "secure[d] in [the] patrol vehicle." Officer then testified that, in this situation, he planned to "impound [Girlfriend's] vehicle" after he placed her in the patrol car. Officer explained that, as part of the impound process, his department had a set of "rules put in place by the State that law enforcement has to follow" and that "[o]ne [rule] is an inventory of the vehicle and what's inside the vehicle." Officer testified that his plans to impound the vehicle and inventory its contents were "why [he] instructed [Thomas] not to take anything out of the vehicle."

¶8     On cross-examination, Thomas's counsel (Counsel) asked Officer questions about searching Girlfriend upon her arrest. As relevant here, Counsel asked whether, "since [Girlfriend] was already under arrest and in [Officer's] vehicle, [Officer] didn't *have a right* to search the vehicle as a search incident to arrest." (Emphasis added.) The State objected on relevance grounds, prompting a sidebar conference. Counsel clarified that his purpose in asking the question was "to show that . . . [Officer] couldn't have searched [Girlfriend's] purse incident to arrest" and that, therefore, "it's not obstruction of justice to remove the purse." The State responded by arguing that whether Officer had a legal right to search the purse was irrelevant to the issue of whether Thomas "attempted to obstruct by removing the purse." During the discussion, the court asked, "[I]sn't that a legal question?," to which the State answered in the affirmative. But Counsel asserted that "it's a question of fact too" because "[i]t is relevant as to whether there is an obstruction of justice by removing the purse" and that "[i]f it's not evidence, then it's not obstruction of justice." After the sidebar, the court sustained the State's objection, offering its view that Counsel's question asked Officer to answer "a question of law." Counsel then went on to question Officer about the impoundment and inventory process, and Officer clarified that, after an inventory of the car is conducted, the "property will go to the property owner." On

redirect, the State asked if an officer could "allow[] someone to take custody of another's property," to which Officer responded that this was possible but that it's "up to [the] officer's discretion." The State then rested, and Thomas chose not to testify.

¶9     At the conclusion of evidence, the court gave additional instructions to the jury. In one of those instructions, the court told the jury that "the subject of penalty or punishment is not to be discussed or considered by you and must not in any way affect your verdict."

¶10     After deliberation, the jury found Thomas guilty on all three charges. Later, the court sentenced Thomas to jail, but it suspended all but seven days (already served) of that sentence and placed Thomas on probation, subject to conditions.

ISSUES AND STANDARDS OF REVIEW

¶11     Thomas now appeals his convictions, and he raises two issues for our review. First, with regard to his conviction for obstruction of justice, he challenges the trial court's decision to sustain the State's objection to Counsel's question—put to Officer on cross-examination—about whether Officer had a "right" to search Girlfriend's vehicle as a search incident to arrest. "When reviewing a trial court's decision to limit cross-examination, we review the legal rule applied for correctness and the application of the rule to the facts of the case for an abuse of discretion." *State v. Eddington*, 2023 UT App 19, ¶ 19, 525 P.3d 920 (cleaned up).

¶12     Second, with regard to all three convictions, Thomas challenges the court's decision to tell the jury that the crimes with which he was charged were misdemeanor offenses. Thomas acknowledges that this issue is unpreserved, and he asks us to review it for plain error, which is an exception to our preservation requirement. *See State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657. Because a plain error claim "involves no lower court ruling,

we decide the claim in the first instance as a matter of law." *State v. Dew*, 2025 UT App 22, ¶ 28, 566 P.3d 53, *cert. denied*, 568 P.3d 264 (Utah 2025).

## ANALYSIS

### I. Ruling Sustaining the State's Objection

¶13 With regard to the court's ruling sustaining the State's objection to Counsel's question during cross-examination, Thomas asserts that this ruling prevented him from adequately presenting his defense that "he lacked the necessary mens rea to commit obstruction" of justice. For the reasons discussed, we discern no abuse of discretion in the court's decision to sustain the State's objection to the specific question posed.

¶14 To convict Thomas of obstruction of justice, the State had to prove that Thomas took at least one of several enumerated actions, including "remov[ing] an item," and that he did so "with intent to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person." Utah Code § 76-8-306(2).[2] Thomas argues that the line of questioning Counsel was posing to Officer was intended to elicit evidence about whether Girlfriend's purse was "part of the current investigation" Officer was conducting, a fact he asserts is relevant to whether he had the requisite "intent to delay or hinder an investigation."

¶15 We can certainly see how questioning Officer about his investigative plans would bear on Thomas's intent. After all, if

---

2. This statute was amended in 2024 and, as a result, some of the subsection numbers changed. *Compare* Utah Code § 76-8-306 (2025), *with id.* § 76-8-306 (2021). But because the relevant statutory language remained unchanged from 2021, we cite the current version for convenience.

Officer didn't intend to ever search the vehicle or the purse, and Thomas was aware of that, then Thomas's efforts to take the purse out of the car might not have been intended to thwart a law enforcement investigation. So questions about Officer's investigatory plans, and about Thomas's knowledge of those plans, were relevant to whether Thomas had obstructed justice.

¶16    But the question that drew the State's objection was far more specific than that. Counsel asked Officer for his opinion about whether he "ha[d] a *right* to search the vehicle as a search incident to arrest." (Emphasis added.) With that question, Counsel wasn't asking Officer about the scope of his intended investigation, nor was he asking Officer anything about Thomas's state of mind regarding the investigation. Counsel asked only whether Officer had the right to search the vehicle pursuant to one specific legal doctrine: a search incident to arrest. This question was objectionable, for two related reasons.

¶17    First, it asked for a legal conclusion. "Under Utah case law, a witness may not testify to a legal conclusion." *State v. Brown*, 2025 UT App 52, ¶ 17, 569 P.3d 259, *petition for cert. filed*, July 2, 2025 (No. 20250740). "[W]itnesses give improper legal conclusions when they couch their opinions as legal conclusions, tie their opinions to the requirements of Utah law, or otherwise tell the jury what conclusion to reach." *Id.* ¶ 18. The facts in *Brown* are illustrative of the limitations of permissible testimony. In that case, this court determined that a detective's testimony that the defendant's actions constituted criminal mischief rather than aggravated assault was an impermissible legal conclusion. *Id.* ¶¶ 20–21. In making our decision, we noted that the detective's testimony was improper because it "instruct[ed] the jury on the correct legal resolution of issues within" the law. *Id.* ¶ 21.

¶18    Here, Counsel phrased the question in terms of whether Officer had a "right" to search Girlfriend's car incident to her arrest. This question called on Officer to evaluate the legal limits

of the search-incident-to-arrest doctrine and offer an opinion to the jury about whether he had the legal authority to conduct that type of search at that time. Thus, the question called for an impermissible legal conclusion because it required Officer to "tie [his] opinions to the requirements of [the] law." *Id.* ¶ 18.

¶19 Second, and relatedly, the question sought information that was not directly relevant to the issue at hand. What mattered here was whether, by removing Girlfriend's purse from the car, Thomas intended to "hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment" of Girlfriend. Utah Code § 76-8-306(2). And as noted above, matters relevant to that inquiry include Officer's investigatory plans and Thomas's state of mind. But one thing that is *not* relevant to that inquiry is whether Officer had the *legal right* to search the purse incident to his arrest of Girlfriend. A person can be guilty of obstruction of justice even if the investigation the person intentionally hinders turns up no criminal activity at all. *See State v. Paule*, 2024 UT 2, ¶¶ 52–58, 554 P.3d 844 ("Whether the defendant's—or any other person's—conduct was actually the *actus reus* of a criminal offense has no bearing on the defendant's intent to obstruct justice."). Similarly, a person can be guilty of obstruction of justice even if the part of the investigation the person intentionally hinders is later deemed to have involved an unlawful search. Stated another way, if Thomas believed that Officer was about to search the purse as part of his investigation of Girlfriend, and if Thomas removed the purse from the car in an effort to hinder that investigation, then Thomas is guilty of obstruction of justice even if a court were to later determine that Officer's search of the purse was unlawful. In this vein, we note that it would have been Girlfriend—and not Thomas—who would have had standing to challenge the legality of any search of the purse. *See State v. Oryall*, 2018 UT App 211, ¶ 6, 437 P.3d 599 (noting that, to challenge the legality of a search, an individual must "demonstrate a legitimate expectation of privacy in the area searched" (cleaned up)); *see also Alderman v. United States*, 394 U.S.

165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted.").

¶20  Moreover, even if the legality of the search were somehow relevant here, a question about whether Officer had the right to search Girlfriend's purse as part of a search incident to arrest does not necessarily bear on whether Officer had the right to search the purse generally, pursuant to some other legal doctrine. Indeed, Officer implied, during his testimony, that he intended to search the purse as part of an inventory search of the impounded vehicle, not as a search incident to Girlfriend's arrest. And—significantly—Thomas does not even begin to grapple with the question of whether Officer would have had the right to search Girlfriend's purse in any event, given that Girlfriend was a parole fugitive. *See Samson v. California*, 547 U.S. 843, 857 (2006) ("[T]he Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee.").

¶21  Accordingly, the specific question Counsel posed was indeed objectionable, and on this record the trial court did not abuse its discretion by sustaining the State's objection. That is not to say, however, that Counsel's entire line of questioning was impermissible. Counsel certainly could have probed Officer—without asking him to provide an opinion on whether he had the right to search pursuant to a particular legal doctrine—about whether Officer intended to search the purse as part of his investigation. Indeed, Counsel did ask other questions aimed at these issues; in particular, Counsel questioned Officer about his department's inventory search policies and about whether (and when) a detained individual would be able to receive personal property following an impound inventory of a vehicle. We note that Counsel could have made further inquiries along these lines, and we observe that Thomas does not assert, here on appeal, that the trial court otherwise improperly hindered that effort.

¶22    But what we are asked to consider here is whether the trial court abused its discretion in sustaining the State's objection to a particular question. And because that question asked for a legal conclusion and sought irrelevant information, the court did not abuse its discretion in sustaining the objection. We therefore reject Thomas's first argument.

## II. Jury Instructions Regarding Offense Levels

¶23    Next, Thomas challenges the trial court's decision to tell the jury that the crimes with which Thomas was charged were misdemeanor offenses. Thomas acknowledges that this challenge is not preserved for our review on appeal, and so he asks us to review it for plain error, one of the exceptions to our preservation rules. *See State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657. "To prevail on plain error review, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cesspooch*, 2024 UT App 15, ¶ 7, 544 P.3d 1046 (cleaned up), *cert. denied*, 550 P.3d 994 (Utah 2024).

¶24    In this situation, the State does not contest Thomas's assertion that the trial court committed obvious error and that therefore the first two elements of plain error are met here. But the State asserts that Thomas's plain error claim falters on the third element, because Thomas cannot demonstrate any reasonable likelihood of a more favorable result if the jury had not been told that the crimes at issue were misdemeanors. For the reasons discussed, we agree with the State.

¶25    "Punishment is not a proper matter for jury consideration." *State v. Garcia*, 2025 UT App 119, ¶ 38 (cleaned up). Under our law, it is usually error for a trial court to tell the jury about the severity of a given offense (e.g., felony or misdemeanor, or which level of felony or misdemeanor). *See id.* And we have previously held—several times—that the law on this point is clear enough that this

sort of error is considered "obvious" for purposes of plain error analysis. *See id.* ("Informing the jury of a classification of an offense is an obvious error because the classification of an offense is directly tied to its punishment and punishment is not a proper matter for jury consideration." (cleaned up)); *State v. Williams*, 2025 UT App 118, ¶ 35 (concluding that the trial court "obviously erred" when it informed the jury of the classification and potential punishment of the charged offense); *Cesspooch*, 2024 UT App 15, ¶ 13 ("Since sentencing was the court's prerogative and not the jury's, we conclude that the court committed obvious error by instructing the jury about these classifications."). Accordingly, the court committed obvious error here, and we must therefore assess whether that error prejudiced Thomas.

¶26    To make the necessary showing of prejudice, Thomas must demonstrate that "absent the error, there is a reasonable likelihood of a more favorable outcome." *Cesspooch*, 2024 UT App 15, ¶ 14 (cleaned up). "Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86; *see also Cesspooch*, 2024 UT App 15, ¶ 14 (stating that, in this context, we must "ask[] whether we remain confident that the verdict would be the same had the improper information been excluded" (cleaned up)); *State v. Soto*, 2022 UT App 107, ¶ 25, 518 P.3d 157 ("Under a counterfactual analysis, we consider whether, in the absence of the improperly admitted evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." (cleaned up)).

¶27    Thomas asserts that he was prejudiced because, after being told that the crimes in question were misdemeanors, "jurors knew that" the crimes were "not as serious as a felony offense," and he posits that this knowledge "made it tempting to convict on weaker evidence, because the jury reasonably knew that

punishment would be less for less-serious charges." He characterizes the evidence against him as "not overwhelming," and he theorizes that the jury's knowledge that the crimes were misdemeanors must have been a material factor in its decision to convict him. We see things differently.

¶28    As an initial matter, the evidence against Thomas on at least two of the charges—for failure to stop at the command of a law enforcement officer and interference with a law enforcement officer—was indeed overwhelming. Officer testified clearly and without contradiction that Thomas disobeyed his command not to remove Girlfriend's purse from the car; that Thomas resisted Officer's attempts to place him under arrest; and that Thomas "ran up his front steps and went into his house" after Officer pulled out his taser. Counsel did not meaningfully cross-examine Officer on these points, and Thomas did not offer any evidence to the contrary. And in closing argument, Counsel did not argue that these events did not happen as Officer described. We therefore have no difficulty concluding that Thomas has failed to demonstrate any reasonable likelihood of a different result on these two charges.

¶29    The question is somewhat closer with regard to the obstruction of justice charge, but in the end we reach the same result, guided by our recent decisions in *Cesspooch*, *Garcia*, and *Williams*. In *Cesspooch*, this court determined that the defendant was not prejudiced when the court read the classifications of the charged offenses to the jury, in part because the statements were "somewhat buried" in the middle of an instruction and no parties emphasized the classifications as "the focus of any argument." 2024 UT App 15, ¶ 18. Based in part on these facts, we concluded that there was "little reason to believe that the jury was focused on these classifications when it deliberated in this case." *Id.*

¶30    Similarly, in *Garcia*, we held that informing the jury, at the beginning of the trial, that the defendant was charged with first-

degree felonies did not prejudice the defendant. 2025 UT App 119, ¶ 41. As in *Cesspooch*, the classifications were presented one time and were part of another instruction explaining the elements of the charged crimes. *Id.* ¶ 42. And we emphasized that, even though the court and defense counsel agreed that it was "unlikely that the jury would recall the offense classifications from the beginning of trial," the jury was also instructed that it was "to not consider punishment" in its deliberation, further mitigating any risk of prejudice. *Id.*

¶31 And in *Williams*, the trial court informed the jury not only of the classification of the charged offense but also that the defendant "faced a sentence of five years to life if convicted." 2025 UT App 118, ¶ 35. There, the court engaged in a somewhat in-depth discussion, during jury selection, about the charge and its associated penalty, stating as follows:

> This is not a capital murder case, this is not one in which the Defendant upon a finding of guilty could be sentenced to death. This is a case in which the penalty, which you are not to be concerned with, would be that of five years to life in the Utah State prison. It is a first-degree felony.

*Id.* ¶ 15. As in *Garcia*, the jurors in *Williams* were instructed not to consider possible punishment; indeed, they were specifically told not to "discuss [or] consider the subject of penalty or punishment" and that "[t]he penalty and punishment for the crime charged must not in any way affect [their] decision as to the guilt or innocence of the defendant." *Id.* ¶ 39. On those facts, we determined, as part of a broader cumulative error analysis, that informing the jury of the classification and possible sentence did not prejudice the defendant. *Id.* We noted the "strong evidence" the State had introduced indicating the defendant's guilt. *Id.* ¶ 41. And we observed that, even if an objection had been raised to the court's statements about offense severity, the "trial court likely

would have given the potential jurors an instruction to not concern themselves with the possible punishment and [would have] included a jury instruction stating the same, which is exactly what happened" anyway. *Id.* ¶ 39.

¶32    The facts of this case are similar, in important ways, to the facts of *Cesspooch*, *Garcia*, and *Williams*. As in *Garcia* and *Cesspooch*, the jury heard about offense severity not in isolation but as part of a broader statement providing preliminary information about the case. As in *Cesspooch*, no party so much as mentioned the offense classifications again. And as in *Garcia* and *Williams*, jurors received a specific and separate instruction informing them that "the subject of penalty or punishment is not to be discussed or considered . . . and must not in any way affect [the] verdict." If anything, the potential for prejudice is less present here than it was in *Williams*, where the court not only mentioned the offense severity but also told the jury what the potential sentence would be following a conviction, *see id.* ¶ 15; in this case, the jury was never told what the specific sentencing range would be.

¶33    Moreover, although the evidence in the State's favor on the obstruction of justice charge was perhaps not quite as clear-cut as on the other charges, that evidence was still quite compelling. The evidence certainly allowed for a reasonable inference that Thomas knew that Girlfriend had a significant criminal history and was a parole fugitive. While no contraband was found in Girlfriend's purse, no evidence was presented indicating that Thomas knew that at the time he took the purse from the car. Thus, the evidence clearly supported a reasonable inference that Thomas's intent in taking the purse from the car involved hindering an investigation of Girlfriend for parole violations or other criminal activity. In the end, given the totality of the circumstances presented here, we are simply not convinced that the jury's knowledge regarding the severity of the charges against Thomas played a significant role in its determination to find Thomas guilty of obstruction of justice. Because Thomas has not made the necessary showing of

prejudice, we reject Thomas's claim that the trial court committed plain error in informing the jury that the crimes at issue were misdemeanors.

## CONCLUSION

¶34    The trial court did not abuse its discretion in sustaining the State's objection to Counsel's question. And although the trial court obviously erred in telling the jury the classifications of Thomas's charges, Thomas has not demonstrated that he was prejudiced by the error. Accordingly, we reject Thomas's appellate arguments and affirm his convictions.

———————